**STATE of Missouri, Respondent,**

v.

**Lamont C. KEMP, Appellant.**

**No. SC 87371.**

Supreme Court of Missouri, En Banc.

Jan. 30, 2007.

Margaret M. Johnston, Office of Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

A jury convicted Lamont Kemp of felonious restraint and unlawful use of a weapon for holding his girlfriend, Jackie Washington, hostage at gunpoint beginning the evening of October 10, 2003, and ending at approximately 8:30 a.m. the following day. Because the state was unable to procure Jackie as a witness at trial, it introduced evidence of Jackie's out-of-court statements through the testimony of Kemp's neighbors and a portion of the 911 call made the morning of October 11. Kemp appeals the trial court's admission of Jackie's out-of-court statements. He contends that the trial court abused its discretion in admitting the statements under the excited utterance exception to the rule against hearsay evidence and that admission of the statements violated his constitutional right to confront the witnesses against him. The judgment is affirmed.

## I. Facts

On the morning of October 11, 2003, Laura Johnson was watching television in her living room on the outskirts of Columbia, Missouri, while her husband Michael slept in their bedroom. At about 8:30 a.m., Laura heard someone banging on the door and a woman screaming, "Help me, please help me." Laura looked out the living room window and saw a woman wearing a little green chemise that covered her below the waist. She was naked above the waist.

Michael, wakened by the banging and screaming at the door, emerged from the bedroom. Laura reported to him what she had seen. Michael put on some pants and ran out the front door, but he saw nothing. He asked Laura where the woman had gone. Laura told him the woman had run down the street. Michael ran after the woman and saw her running south on Scott Boulevard. She was still naked above the waist and falling to the ground as she tried to run. Michael described her as "frantic" and "emotionally distraught"; she was crying, having trouble breathing, and shaking. When Michael caught up to her, she told him that her boyfriend had been holding her hostage at gunpoint all night.

Michael brought the woman, who identified herself as Jackie Washington, back to the Johnson home. On the way there, Jackie fell several times. She and Michael entered the Johnson home through the back door. Once inside, Jackie remained frantic. She was crying and bending down and taking deep breaths. According to Laura, she looked "very frantic, very upset, very emotional," and "all in a fit."

Laura heard her saying, "Oh God, please help me. Please help me."

Laura called 911. Although only Laura spoke directly to the operator, several persons, including Jackie, can be heard speaking in the background:

[0:19]

LAURA: It's OK.

911: 911, what is your emergency?

LAURA: Um, yes, we had this lady that came screaming down the street banging on our door yelling, "Help! Help! Call the cops!" and she's in our yard right now half naked.

[pause]

And she's not telling us exactly why, she's just hysterical. [giggles]

[pause]

My husband's trying to calm her down right now.

911: Is she white or black?

LAURA: Black.

911: Adult?

MICHAEL: ... telling me that her boyfriend ... [inaudible]

LAURA: Um ... what? What?

MICHAEL: ... locked up ...

LAURA: Hold on.

MICHAEL: He's had her locked up for eight hours with a gun.

[1:00]

LAURA: Oh, she says her boyfriend has had her locked up for eight hours with a gun and she was just now able to escape.

911: Where is the boyfriend?

LAURA: Where's the boyfriend, Michael?

MICHAEL: I don't know. Across the street?

LAURA: We don't ... across the street from us, down the street, we're not sure. [pause] She's an adult, looks like an adult, at least.

[pause]

911: There's a gun, maybe. [pause] No.

JACKIE: ... couldn't get out 'til a while ago.

911: So the boyfriend's across the street down the road, do we know an address?

LAURA: Ma'am, do we know an address where he is?

UNIDENTIFIED WOMAN: [Address omitted].

LAURA: [Address omitted].

JACKIE: Oh God.

911: Is she OK? Does she need an ambulance?

LAURA: Do you need an ambulance or anything?

JACKIE: [breathing heavily] I think I'm OK.

LAURA: She thinks she's OK, she's just really scared.

JACKIE: [inaudible]

[2:07]

911: Is she inside with you now?

LAURA: Yeah, she's inside with us right now.

911: What's her name?

LAURA: What's your name, ma'am?

JACKIE: Jackie.

LAURA: Huh?

JACKIE: Jackie.

LAURA: Jackie.

JACKIE: Washington.

LAURA: Washington.

911: What's his name—what's the boyfriend's name?

LAURA: What's your boyfriend's name?

JACKIE: Lamont Kemp.

LAURA: Lamar Kemp?

911: OK. [pause] And he is still in, in the apartment across the street?

LAURA: And he's still in the apartment you believe?

JACKIE: Yeah.

LAURA: Yes.

JACKIE: He got a gun.

LAURA: He has a gun.

911: What kind of gun is it?

LAURA: What kind of gun, ma'am?

JACKIE: I don't know, it's a big one.

LAURA: She doesn't know. It's a big one.

911: OK.

LAURA: Is it like a . . .

911: Lamar Kemp.

LAURA: [whispering] You got a shirt she can put on? [pause] Here, ma'am. [3:09]

911: Can you ask her if it's like a shotgun or a pistol?

JACKIE: A pistol.

LAURA: Pistol.

911: It is a pistol?

LAURA: Yes.

911: Ask her if it's black or silver.

LAURA: Black or silver?

JACKIE: Silver.

LAURA: Silver.

JACKIE: [inaudible]

LAURA: Mmm-hmm.

911: Does she know where he hides it?

LAURA: Do you know where he keeps it?

LAURA: No.

JACKIE: Didn't even know it was in the house.

LAURA: She didn't even know he had it.

911: OK. Is there anybody else in the house with him?

LAURA: Anybody else in the house with you guys?

JACKIE: No.

LAURA: No.

911: OK.

UNIDENTIFIED WOMAN: Two dogs.

JACKIE: Yeah.

LAURA: Two what?

JACKIE AND UNIDENTIFIED WOMAN: [in unison] Two dogs.

LAURA: Two dogs. [inaudible] down there?

UNIDENTIFIED WOMAN: Yeah, right across the street.

LAURA: Oh, they just moved in. Oh, gracious. One's a pit bull, isn't it?

JACKIE: Yeah.

LAURA: One's a pit bull.

911: Ask her if it's . . . mean.

LAURA: Is it a mean pit bull?

JACKIE: No.

LAURA: No.

JACKIE: They on the back porch.

LAURA: They're on the back porch right now.

JACKIE: They're not in the house. [4:00]

LAURA: They're not in the house. So he doesn't know you're gone yet, does he?

JACKIE: Yeah, he chased me.

LAURA: Oh, he ch-

911: He did chase her?

LAURA: Yes.

911: So does he know where she's at then?

LAURA: Does he know where you are?

JACKIE: I don't know.

LAURA: We don't know.

JACKIE: He's probably knocking on the doors.

911: OK. So the last time she saw him, he was not in the apartment, right?

LAURA: He was on the back porch. [pause] You want to have a seat on the couch? [pause] Come sit down on the couch.

[Jackie breathing heavily]

911: Do you think she needs an ambulance?

LAURA: Do you think you need some medical treatment? Is your chest bothering you that bad, ma'am?

JACKIE: (inaudible)

911: Is she having chest pain?

LAURA: A little bit, probably from running and screaming. She thinks she's OK, though.

911: Can I have your name?

LAURA: Laura, L–A–U–R–A, Johnson.

911: OK. And you're at [phone number omitted]?

LAURA: Yes.

911: And you're at [address omitted], right?

LAURA: Correct. He's, I guess now that I know he's right across the street from us.

911: Yeah. And you're in apartment A also?

LAURA: Correct.

911: OK.

LAURA: And he's in apartment B.

911: OK.

[5:10]

LAURA: [laughs] [pause] Michael?

911: I've got five officers on the way, so . . .

LAURA: OK. He's in the duplex right across the street.

MICHAEL: Yeah, I know.

LAURA: They got five cops on the way.

MICHAEL: Sounds like there's drug use involved?

JACKIE: Maybe. [inaudible]

[Laura laughs]

MICHAEL: Was there drug use . . . sounds like there's drug use involved?

911: Was there drug use involved?

JACKIE: Yeah, [inaudible].

LAURA: Yeah, there's drug use involved.

JACKIE: He was smokin' crack.

LAURA: Crack.

911: He is? Was she also?

LAURA: No, he was.

911: OK.

JACKIE: . . . and he got up and went in the bathroom. He started gettin' high and he called me, and my dumb ass went in there. He got this gun in the back of his pocket and he [inaudible].

MICHAEL: What type of gun did he have?

911: Did he have her tied up, or . . . ? [5:59]

LAURA: Did he have you tied up or just locked in the bathroom?

JACKIE: No, he had, he had the gun on me, he had me sittin' down with him like this while he's wavin' the gun around talkin' 'bout he's seein' people. This been goin' on all night.

911: OK.

LAURA: Did you hear that?

911: Yeah.

LAURA: OK.

JACKIE: Talkin' about somebody's coming in the house to come and kill me.

911: Hello? [pause] Right. [pause] Apartment B.

LAURA: We think he's out front.

911: You do?

LAURA: Yeah.

911: Of your house?

MICHAEL: No, stay there.

LAURA: Um, we don't know.

MICHAEL: On her front porch.

LAURA: On her front porch.

UNIDENTIFIED WOMAN: On my front porch?

MICHAEL: Yeah.

UNIDENTIFIED WOMAN: Or is it my boyfriend?

JACKIE: No.

MICHAEL: OK.

LAURA: Is that him? No. OK.

911: It's not him?

LAURA: He's still in the back. No.

UNIDENTIFIED WOMAN: That's my boyfriend.

LAURA: [laughs] That's somebody else's. [laughs]

[inaudible conversation at Johnson home]

LAURA: No problem.

MICHAEL: No problem, ma'am.

POLICE RADIO: Are we talking about large dogs as well?

911: How big are the dogs?

[7:01]

LAURA: Um ... the dogs ... small or medium. Well, the pit bull's about medium.

JACKIE: They're not even in the house. The dogs ain't even no issue. The dog's on the balcony.

UNIDENTIFIED WOMAN: The dogs are fine.

LAURA: The dogs are fine. I, they're, they're ... littler.

911: OK.

LAURA: They're not a problem, she said.

911: Does she think he might have run off or does she think he went back in the apartment?

LAURA: Do you think he ran off or might still be there?

JACKIE: He's, he's, he's in there.

LAURA: He's probably still there, most likely.

911: OK.

LAURA: Most likely ·in the apartment.

911: OK. [pause] And she doesn't know of any other weapons that are in there?

LAURA: No.

911: OK.

[20–second pause]

[8:01]

911: I just wanna, I wanna keep you on the phone in case you guys see him or he tries to do something else.

LAURA: That's fine.

911: I think they're gettin' close, so ...

LAURA: He works for the Department of Corrections.

[inaudible conversation at Johnson home]

LAURA: Boonville.

UNIDENTIFIED WOMAN: I thought so.

LAURA: We're trying to get on with the sheriff.

UNIDENTIFIED WOMAN: I used to work [inaudible].

LAURA: Oh! We did for a little bit.

[inaudible conversation at Johnson home]

911: Has she calmed down?

LAURA: Yeah, she's OK.

911: OK.

[inaudible conversation at Johnson home]

[9:01]

LAURA: OK.

[10–second pause]

[9:13]

911: Yes? Yes? [pause] Yes. Yes.

[19–second pause]

[9:39]

LAURA: Why don't you get your shoes on, Mike.

MICHAEL: [inaudible]

LAURA: She wants to get a cigarette for her.

[12–second pause]

[10:00]

911: I've got a couple officers in the area. They want me to keep you on the phone.

LAURA: That's fine. [pause] I understand how that goes. My dad's an officer.

911: Oh.

LAURA: He taught me quite well.

911: Yeah, that's good.

MICHAEL: [inaudible]

LAURA: They said there's a couple across the street right now.

911: Yeah, I think they're going to try to search the—try to find him first.

LAURA: Yeah, they want you to stay here, ma'am, until he gets settled.

[55–second pause; police radio audible] [11:20]

911: OK, there's going to be an officer coming over to talk to her.

LAURA: OK.

JACKIE: [inaudible] . . . or anything?

LAURA: [laughs] Do I what?

JACKIE: . . . any . . . [inaudible].

LAURA: [laughing] I'm sure we do, you want to come upstairs? That's fine.

JACKIE: I've never been so scared in my whole [inaudible].

LAURA: It's OK. Let me go look real quick, OK? [pause] . . . go talk to. . . .

911: Is she still there with you?

LAURA: Yeah, she's still with us.

911: OK. [pause] As soon as they make contact with her, then I can go ahead and hang up.

LAURA: OK. That's fine.

JACKIE: [inaudible]

[pause]

MICHAEL: [inaudible]

[12:15]

911: Does she have a phone number for . . . him? For his house?

LAURA: Ma'am, he's not answering the door. Do you have a phone number?

JACKIE: Um . . . [phone number omitted].

LAURA: [phone number omitted]

JACKIE: Um, [phone number omitted].

911: OK.

LAURA: [phone number omitted]

911: Suspect phone number's in the [inaudible].

LAURA: . . . officer talk to her. There's somebody, I think.

911: There is? OK.

LAURA: Hold on. Let me open it and make sure. Is there an officer, Michael?

MICHAEL: Yes.

LAURA: Yeah.

911: All right. Thanks.

LAURA: Bye.

911: Bye-bye.

[12:51]

The Columbia police department dispatched five officers to Kemp's apartment. The officers knocked on the door and on the side of the house and called the residence from a cell phone. No one answered. After about an hour, a sergeant on the scene reported to his district captain, and the captain called a Code Red, which is a call for other officers to assist in the investigation. Approximately twenty tactical officers and fifteen crisis negotiators subsequently arrived. The newly dispatched officers began calling the residence. After a couple of minutes Kemp answered and he emerged from the apartment. Inside the apartment, the officers found three guns: a .40 caliber Smith & Wesson handgun and a .357 revolver, both of which were loaded, and an unloaded .22 caliber handgun. The .40 caliber Smith & Wesson and the .22 were both found in the trash can. All three guns had been stolen from the office of a Columbia businessman about a month before they were found in Kemp's apartment.

A Boone County grand jury charged Kemp with felonious restraint and receiving stolen property (class C felonies) and unlawful use of a weapon (a class D felony). The state subpoenaed Jackie Washington for trial. The state contended that it "expended a great amount of resources attempting to get her served with the subpoena. She was doing her best to avoid

that service. And we ... expended every good-faith effort we possibly could to get her there." Jackie did not testify.

Kemp's first jury trial ended in a mistrial on March 3, 2004. On March 8, 2004, the Supreme Court of the United States decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which changed the procedure under the United States Constitution, Amendment VI, for admitting the out-of-court statements of unavailable witnesses against criminal defendants. Prior to the beginning of Kemp's second jury trial on March 12, 2004, the defense filed a motion in limine to exclude Jackie's statements. The court ruled that Jackie's statements were excited utterances and that they did not violate the Confrontation Clause under *Crawford*.

At trial, the court, over defense counsel's objection, allowed the state to play the following 39–second portion of the 911 recording:

[0:19]

LAURA: It's OK.

911: 911, what is your emergency?

LAURA: Um, yes, we ...

[2:11]

LAURA: What's your name, ma'am?

JACKIE: Jackie.

LAURA: Huh?

JACKIE: Jackie.

LAURA: Jackie.

JACKIE: Washington.

LAURA: Washington.

911: What's his name—what's the boyfriend's name?

LAURA: What's your boyfriend's name?

JACKIE: Lamont Kemp.

LAURA: Lamar Kemp?

911: OK.

[5:52]

JACKIE: ... my dumb ass went in there. He got this gun in the back of his pocket and he [inaudible].

MICHAEL: What type of gun did he have?

911: Did he have her tied up, or ... ?

LAURA: Did he have you tied up or just locked in the bathroom?

JACKIE: No, he had, he had the gun on me, he had me sittin' down with him like this while he's wavin' the gun around talkin' 'bout he's seein' people. This been goin' on all night.

911: OK.

LAURA: Did you hear that?

911: Yeah.

The court allowed the following testimony of Michael Johnson:

Q: And what did you see when you got out the front door?

MICHAEL: First off I didn't see anybody. And then I asked my wife where, you know, where she went. And she said that she ran down the street.

Q: So what did you do?

MICHAEL: I ran after her.

Q: Okay. And what did you see when you went after her?

MICHAEL: She was on Scott Boulevard South. And she was running south on Scott Boulevard. And she was trying to—trying to run, but she'd be—she'd fall to the ground.

Q: What did she—How was she dressed?

MICHAEL: She was in a nightgown type attire. She didn't have any—anything from the top, from the waist up. And she was[,] she was in just a—she was frantic.

Q: I was going to ask you. What did you observe about her emotional state?

MICHAEL: Oh, she was frantic, she was crying, she was having trouble breathing, shaking.

Q: What was she saying?

[Objection by defense counsel on hearsay grounds overruled.]

MICHAEL: She was stating, you know, frantically that her boyfriend had been holding her hostage at gunpoint all night and wasn't letting her leave.

The court allowed the following testimony of Laura Johnson:

Q: Okay. And did she come back into your house?

LAURA: Eventually. She was escorted back into the house by my husband.

Q: What did she look like when she came into your house?

LAURA: She was crying, and bending down and deep breaths, and looked very frantic, very upset, very emotional, saying, "Oh God, help me. Please help me," and just all in a fit.

. . .

Q: Did she tell you what happened?

[Objection by defense counsel on hearsay grounds overruled.]

LAURA: She said that she had been held in her basement by her boyfriend at the time, Lamont Kemp, at gunpoint, since 9 o'clock the previous night, and that she had just gotten out of the house when she came banging on our door.

The jury found Kemp guilty on all three counts. The defense moved for a new trial on all counts. The court denied the motion on Count I (felonious restraint) and Count II (unlawful use of a weapon). The court granted the motion on Count III (receiving stolen property), but the state entered nolle prosequi on that count before a new trial was held. The court sentenced Kemp, a prior and persistent offender, to seven years in the department of corrections for felonious restraint and four years in the department of corrections for unlaw-

ful use of a weapon, with the sentences to run concurrently.

This Court ordered transfer of the case after opinion by the court of appeals. Mo. Const. art. V, sec. 10. Since the case was transferred, the Supreme Court of the United States decided *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

## II. Issues on Appeal

This appeal focuses upon the admission of the out-of-court statements of Jackie Washington. Two hurdles must be cleared for this evidence to be properly admitted. First, the statements must survive traditional hearsay analysis. Second, because this is a criminal case, the statements must survive Sixth Amendment Confrontation Clause analysis.

### A. Excited Utterance Exception to the Hearsay Rule

Kemp argues that the trial court erred in admitting Jackie's out-of-court statements because they did not fall under the excited utterance exception to the rule against hearsay evidence.

#### 1. Standard of Review

■ A trial court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. [T]hat discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Additionally, on direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a

reasonable probability that the trial court's error affected the outcome of the trial.

*State v. Forrest,* 183 S.W.3d 218, 223–24 (Mo. banc 2006) (internal citations and quotation marks omitted).

### 2. Analysis

■ "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Forrest,* 183 S.W.3d 218, 224 (Mo. banc 2006). Jackie did not testify at trial, but her statements about what happened to her the night of October 10–11, 2003, were introduced through the testimony of Michael and Laura Johnson and the 911 call. These out-of-court statements were used to prove the truth of the matter asserted: that Kemp had held Jackie at gunpoint all night. The statements are hearsay.

■ In order to be admissible, Jackie's statements must fall under an exception to the general rule against hearsay evidence. The trial court admitted the statements under the excited utterance exception. "The excited utterance exception to the hearsay rule depends on a startling or unusual occurrence sufficient to overcome normal reflection such that the ensuing declaration is a spontaneous reaction to the startling event." *Bynote v. National Super Markets, Inc.,* 891 S.W.2d 117, 122 (Mo. banc 1995) (internal quotation marks and alterations omitted).

Courts have determined that excited utterances are inherently trustworthy because the startling nature of the event is speaking through the person instead of the person speaking about the event. Because the statement is spontaneous and made under the influence of events, the statement is assumed trustworthy because it is unadorned by thoughtful reflection. Among the factors to be considered in determining whether an excited utterance exists are [1] the time between the startling event and the declaration, [2] whether the declaration is in response to a question, [3] whether the declaration is self-serving, and [4] the declarant's physical and mental condition at the time of the declaration. While no one factor necessarily results in automatic exclusion, all should be considered in determining whether the declaration was the result of reflective thought.

*Id.* (internal quotation marks, alterations, and citations omitted).

The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy. This exception is premised on the idea that where the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event, the utterance may be taken as expressing the true belief of the declarant.

*State v. Strong,* 142 S.W.3d 702, 718 (Mo. banc 2004) (internal quotation marks and citations omitted).

#### a. Jackie's Statements to Michael

■ Shortly before Jackie made the disputed statement, Michael saw her running down the street, naked from the waist up and covered by only a nightgown from the waist down. He saw her falling down as she tried to run. He described her as breathing heavily, crying, and shaking. When she made the statement, she had not yet covered her partially naked body, although she was running down a street in her neighborhood at 8:30 on a Saturday morning. There can be no doubt that Jackie's statement may be taken as ex-

pressing her true belief, because it was "made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event." *State v. Strong*, 142 S.W.3d at 718. The trial court did not abuse its discretion in admitting Michael's testimony.

### b. Jackie's Statements to Laura Audible on the 911 Call

■ Laura Johnson's testimony and the 911 call both arise from the time Jackie was brought inside the Johnson home and the 911 call was made. Laura testified that Jackie was crying, bending over and taking deep breaths. Laura described her as looking "very frantic, very upset, very emotional, saying, 'Oh God, help me. Please help me,' and just all in a fit." When she made the statements admitted through the 911 recording, Jackie sounds breathless and frantic. At other times during the call, she can be heard saying, "Oh God," and breathing heavily enough to prompt the operator to ask if she needed an ambulance. Again, Jackie's behavior leaves no doubt that for a period of time after she was brought inside the Johnson home, she was still under the "immediate and uncontrolled domination of the senses as a result of the shock produced by the event." *State v. Strong*, 142 S.W.3d at 718. Her statements can be taken as expressing her true belief. The trial court did not abuse its discretion in admitting Laura's testimony and portions of the 911 recording.

### c. State v. Post Requirement of Independent Proof

■ Kemp argues that an excited utterance is only admissible where there is "some independent proof that the event could have occurred ."[1] *State v. Post*, 901

S.W.2d 231, 235 (Mo.App. E.D.1995); *accord State v. Kemp*, 919 S.W.2d 278, 280–82 (Mo.App. W.D.1996). The Court does not need to determine whether independent proof that the event could have occurred is required, because it was present in this case. Jackie running frantically down the street partially naked at 8:30 a.m. on a Saturday, and the police finding three weapons in Kemp's apartment, two of which were loaded, provide independent proof that Kemp could have held Jackie at gunpoint all night in his apartment.

### B. Confrontation Clause

Having survived traditional hearsay analysis, Jackie's out-of-court statements must now clear the second hurdle: the Confrontation Clause of the Sixth Amendment, which applies to all criminal prosecutions. Kemp argues that admission of the statements violated his constitutional right to confront the witnesses against him. Although the analysis is similar to the hearsay analysis, this is a separate and distinct evidentiary determination.

### Analysis

■ The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court of the United States held that the Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The testimonial nature of a statement is what

---

1. In adopting the requirement of "some independent proof that the event could have occurred," the *Post* court acknowledged its departure from the majority rule. *Post*, 901 S.W.2d at 235.

makes the declarant a "witness" that the accused has the right to confront. *Id.* at 51, 124 S.Ct. 1354. Although the Court did not precisely define "testimonial," it noted that "[s]tatements taken by police officers in the course of interrogations" are testimonial "even under a narrow standard." *Id.* at 52, 68, 124 S.Ct. 1354. The Court also declined to define "interrogation." *Id.* at 53 n. 4, 124 S.Ct. 1354.

*Davis v. Washington* required the Court to "determine more precisely which police interrogations produce testimony." —— U.S. ——, ——, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006). The issue in Davis was "whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." *Id.* at 2276. The Court held that:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2274.

The Court reasoned that 911 calls, at least initially, have a different objective than that of a classic police interrogation:

When we said in [*Crawford* ] that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or em-

bedded in the memory (and perhaps notes) of the interrogating officer, is testimonial.... A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.... This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot ... "evolve into testimonial statements" once that purpose has been achieved.

*Id.* at 2276 (internal citations omitted).

### a. Jackie's Statements on the 911 Call

■■■ *Davis* provides a functional analysis for determining whether an out-of-court statement is testimonial and, thus, subject to the Confrontation Clause restrictions of *Crawford.* The *Davis* analysis must be applied to the 911 call made by Laura Johnson to determine if it was an interrogation to "enable police assistance to meet an ongoing emergency," or an interrogation "to establish or prove past events potentially relevant to later criminal prosecution" when there is "no such ongoing emergency." *Davis,* 126 S.Ct. at 2274. The circumstances of the situation must be viewed objectively. *Id.*

Any reasonable listener would recognize that Jackie was facing an ongoing emergency. She had last seen Kemp on his back porch. Early in the call, she hypothesized that he was still in his apartment. Later, she said that he had chased her, that she did not know if he knew where she was, and that he was "probably knocking on the doors" of the neighborhood. Jackie's varied answers to questions about Kemp's location, together with the fact that the police had not arrived to secure the area, indicate that no one was certain

where Kemp was, where he was going, or what he might do. All that was known was that, according to Jackie, Kemp was armed, had been smoking crack, and had been holding her at gunpoint all night. Furthermore, Laura described Jackie as "really scared" and "just hysterical." Jackie can be heard on the 911 call breathing heavily and saying, "Oh God." These circumstances indicate that, although Jackie was inside the Johnson home, she and her neighbors were in the midst of an ongoing emergency.

The questions the operator asked were directed at enabling police assistance to meet the ongoing emergency. As the Supreme Court noted in *Davis,* statements necessary to resolve the present emergency include the "operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." *Id.* at 2276. Thus, questions about Kemp's name were directed at resolving the present emergency.

In addition, questions about Kemp's address and possible location would help the police determine where to look first. Questions about the gun and where Kemp hid it would inform the police whether they should expect to encounter an armed person. Questions about drug use would warn the police of possible erratic or dangerous behavior upon arrival. Questions about the dogs would inform the police how many dogs to expect and whether the dogs were hostile. Questions about Kemp's telephone number were necessary to allow the police to call the apartment because no one was answering the door. Finally, questions about whether Jackie needed an ambulance were necessary to determine if anyone on the scene needed emergency medical care. These questions were also directed at resolving the present emergency.

The court only allowed thirty-nine seconds of the 911 call to be played for the jury. In the excerpt, Jackie can be heard saying her name, Kemp's name, that Kemp had a gun, and that "he had, he had the gun on me, he had me sittin' down with him like this while he's wavin' the gun around talkin' 'bout he's seein' people. This been goin' on all night." The court was clearly being cautious in allowing only this short excerpt. Jackie's statements in this excerpt, like her statements in much of the remainder of the call, were made "under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency" and were therefore nontestimonial. *Id.* at 2274. The Confrontation Clause does not prohibit their admission. *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The court did not err in admitting these statements. *See United States v. Clemmons,* 461 F.3d 1057, 1060–61 (8th Cir.2006); *Middleton v. Roper,* 455 F.3d 838, 854–57 (8th Cir.2006); *United States v. Peneaux,* 432 F.3d 882, 895–896 (8th Cir.2005); *United States v. Brun,* 416 F.3d 703, 706–08 (8th Cir.2005); *United States v. Lee,* 374 F.3d 637, 643–45 (8th Cir.2004).

### b. Jackie's Statements to Michael and Laura

■ [T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused.... The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the

purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. *Crawford,* 541 U.S. at 51, 53–54, 124 S.Ct. 1354.

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* at 68, 124 S.Ct. 1354.

When Jackie Washington made the disputed statements to Michael and Laura Johnson, she was not making "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51, 124 S.Ct. 1354. She was not "[a]n accuser who makes a formal statement to government officers." *Id.* She was not giving testimony at a preliminary hearing, before a grand jury, or at a formal trial, and her conversations with Michael and Laura were not police interro-

gations. Jackie made the statements to Michael and Laura to seek immediate emergency help, not to bear testimony. Her statements to them were not testimonial and the Confrontation Clause does not bar their admission. The trial court did not err in admitting these statements.

Moreover, recent decisions from the United States Court of Appeals, Eighth Circuit, indicate that Confrontation Clause protection does not extend to situations where governmental or law enforcement involvement does not exist. *United States v. Peneaux,* 432 F.3d 882, 895–896 (8th Cir.2005); *Ferguson v. Roper,* 400 F.3d 635, 638–640 (8th Cir.2005); *United States v. Lee,* 374 F.3d 637, 643–45 (8th Cir.2004); *United States v. Reyes,* 362 F.3d 536, 540–541 (8th Cir.2004).

### III. Conclusion

The judgment is affirmed.

All concur.