**STATE of Missouri, Respondent,**

v.

**George MYERS, Appellant.**

**No. ED 89170.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 15, 2008.

Application for Transfer to Supreme Court
Denied Feb. 25, 2008.

Application for Transfer Denied
April 15, 2008.

Margaret M. Johnston, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Jefferson City, MO, for respondent.

CLIFFORD H. AHRENS, Judge.

George Myers ("Defendant") appeals from the judgment of the trial court entered after a jury convicted him of one count of second degree murder and one count of distribution of a controlled substance. The trial court sentenced Defendant as a persistent drug offender to consecutive terms of life imprisonment for second degree murder and life imprisonment without parole for distribution of a controlled substance. Finding no error, we affirm.

Viewed in the light most favorable to the verdicts, the facts are as follows. On the morning of March 9, 2004, Joseph Gercone bought ten 80 milligram Oxycontin pills from Defendant. Oxycontin is a time-released form of oxycodone, which is meant to be ingested as a pill and released slowly into a body. Crushing an Oxycontin pill and ingesting or injecting it thereafter delivers the entire dose of oxycodone at once. Gercone crushed some pills in water in a spoon at Defendant's home, and injected himself there. Gercone left and picked up his girlfriend, Megan Williams ("Girlfriend") and a friend, Tanya Baker, and the trio rented a motel room. Gercone and Girlfriend injected crushed Oxycontin in the motel bathroom, and Girlfriend helped Baker inject herself.

Later that same evening, Gercone went back to Defendant's house with a former girlfriend, Jaime McGrael. They were joined subsequently by Girlfriend and Baker. After a fight between Girlfriend and McGrael, Gercone drove off with Girlfriend and Baker in the latter's car, eventually parking a few blocks away. Girlfriend and Baker went back to the motel room, while Gercone returned to Defendant's home. Gercone purchased several more Oxycontin pills from Defendant, and called Girlfriend and Baker, who joined him. Gercone injected himself and Baker, and gave an Oxycontin pill to Girlfriend. Girlfriend asked Defendant to help her with it. Defendant prepared the pill, crushing it in water in a spoon, loading the liquid in a syringe, and injected Girlfriend. He injected her again a few minutes later. McGrael, who was also present at Defendant's home, thought that Defendant had injected too much Oxycontin solution into Girlfriend.

Sometime after midnight, Gercone, Girlfriend, and Baker returned to the motel room. Gercone soon passed out, while Girlfriend and Baker stayed up talking. Girlfriend was nodding off, and they turned off the lights and went to sleep sometime between 2:00 a.m. and 3:00 a.m. No one saw Girlfriend use any more drugs at the motel room after leaving Defendant's house.

Gercone and Baker woke up at approximately 7:20 a.m., and realized that Girlfriend was dead. Gercone called 911, while Baker disposed of the drug paraphanalia. The police soon arrived and examined the scene, which had indicia of drug use. The condition of Girlfriend's body indicated that she likely died at around 6:00 a.m. An autopsy revealed puncture wounds consistent with a needle around her elbow, and marks on her upper leg that may have been puncture marks. Girlfriend died of oxycodone intoxication, with blood work showing that she had between ten to twenty times the therapeutic amount of oxycodone in her system. Girlfriend also had a pulmonary edema, consistent with a death that takes place over a period of hours.

A number of witnesses testified at trial, including Gercone, Baker, McGrael, the pathologist, and experts for both the Defendant and the State. A number of documents and exhibits were introduced into evidence as well, including three written statements made by Gercone to the police.

The jury returned guilty verdicts on the charges of second degree murder and distribution of a controlled substance. The trial court sentenced Defendant as a persistent drug offender to consecutive terms of life imprisonment for second degree murder and life without parole for distribution of a controlled substance.

Defendant now appeals from this judgment.

In his first point relied on, Defendant contends that the trial court erred by abusing its discretion in admitting Exhibit 18, a written statement by Gercone, over Defendant's objection, and in permitting Gercone to testify about statements made by Girlfriend to him that were contained in Exhibit 18. Defendant avers that this denied him his due process rights, including his rights under the Confrontation Clause, in that the contents of Exhibit 18 were hearsay used to prove the truth of the matter asserted, and that he was prejudiced because he could not counter the statements of Girlfriend, which were emphasized by the State in its closing argument.

On direct examination of Gercone, the State did not introduce any of his three written statements. Rather, it was the Defendant who introduced Gercone's first two written statements, Exhibits A and B, during cross-examination. Gercone provided police with his first written statement, Exhibit A, the day that Girlfriend died, and gave his second written statement, Exhibit B, the following day. He made his third written statement, Exhibit 18, the day after he gave his second statement. On cross-examination, the following exchange took place:

Defense counsel: And [the police] asked you to write out a statement?

Gercone: Yes.

Defense counsel: How many pages did you write?

Gercone: I don't know.

Defense counsel: If I told you it was a total of just a few lines, would that be a correct statement?

Gercone: I don't know. I don't know.

Defense counsel: Maybe 12 lines?

Gercone: I don't know.

. . .

Defense counsel: You felt that what you wrote down was enough for the police investigating the death of [Girlfriend]?

Gercone: Yes.

Defense counsel: And the next day you went back and you wrote out another statement?

Gercone: I don't recall. I don't know. I mean, this is a long time ago. I don't know.

. . .

Defense counsel: And on the second statement, I think you wrote out a total of 16 lines?

Gercone: I'm not sure.

Defense counsel had Gercone examine Exhibits A and B, and total the number of lines in each written statement, emphasizing that Exhibit A consisted of 12 lines only and Exhibit B consisted of 16 lines only. Defense counsel's questioning of Gercone on Exhibits A and B stressed that Gercone left many things out of these written statements, such as the disposal of various items of drug paraphernalia by Gercone and Baker prior to the arrival of the police after the death of Girlfriend. There was a further exchange about Exhibit B, as follows:

Defense counsel: And in the second [written statement], we talked about it earlier, you wrote out a total of 16 lines?

Gercone: Yes.

Defense counsel: That was 16 more lines in response to the police officer's questions?

Gercone: Yes.

Defense counsel: You still knew the police were investigating the death of [Girlfriend]?

Gercone: Yes.

Defense counsel: And you wrote out the second statement to try to assist the police?

Gercone: Yes.

Defense counsel: You wrote out what you felt was important information for this death investigation?

Gercone: They weren't asking about that. They wanted to know about [Defendant].

Defense counsel: Okay. You wrote out a total of 16 lines?

Gercone: Yes.

Defense counsel: And you wrote out all you felt was important about [Defendant] in 16 lines?

Gercone: Yes.

Defense counsel: You felt writing out 16 lines was enough for the police to have their investigation on [Defendant]?

Gercone: Yeah, yes.

. . .

Defense counsel: Now, you said the second statement, they're wanting to know information about [Defendant], right?

Gercone: Yes.

Defense counsel: Now, in either the first or the second statement you never said, "I saw George Myers inject Megan Williams with oxycodone."

Gercone: Right.

Defense counsel: Thank you. No more questions, Your Honor.

On redirect examination, the State sought to introduce Exhibit 18, Gercone's third written statement that he made to the police. Defense counsel objected, leading to the following exchange:

Defense counsel: Your Honor, the third statement, I'll stipulate to for the jury, is a total of eight lines, two paragraphs. But we're going to object to that coming into evidence or anything written in that statement into evidence because it's all pure hearsay of what the alleged victim told him. That's—All that is hearsay in that statement, Your Honor.

Court: Maybe, but if you asked once, you asked 12 times the fact that he had written out either 12 or 16 lines.

Defense counsel: And I will stipulate to the fact—

Court: And didn't get a lot of information.

Defense counsel: And I'll stipulate to the fact that he wrote eight more lines. I will stipulate to that.

Court: You kind of set yourself up for this, [defense counsel].

Defense counsel: Okay.

. . .

State's counsel: I think that it is a clear exception [to the hearsay rule], I think it's misleading to not refer to the fact that [Gercone] actually had a third [written statement].

Defense counsel: I think the rules on evidence is [sic] that if you admit a part of the statement, then a complete statement comes in. These are written on three separate days. They are three separate statements.

Court: Well, as I said, if you hadn't made such a big deal about the fact that he only made the two, I would have a different opinion on this, but as I said, you've kind of set yourself up for this.

Defense counsel: And again, I'll stipulate for the record that, I offer to stipulate to the fact that he wrote eight more lines about things that [Girlfriend] had told him.

Court: Understood.

The trial court allowed Exhibit 18 to be entered into evidence, and the State examined Gercone about this written statement.[1] Gercone discussed his third written statement, about how Girlfriend had said that Defendant had hurt her when he injected her with the needle when he "fished around" for a vein to inject in her arm. Two other witnesses, McGrael and Baker, testified that they saw Defendant inject Girlfriend. Baker testified that she saw Defendant inject Girlfriend twice that evening, once with the contents of an oxycontin pill and once with the "wash" or residue from a previously injected pill preparation, and then she, Girlfriend, and Gercone returned to the motel. McGrael testified that at about 1:00 a.m., she saw Defendant inject Girlfriend twice in the arm while they were at Defendant's house, and that Gercone, Girlfriend, and Baker left not long thereafter.

This Court normally reviews rulings on the admission or exclusion of evidence for abuse of discretion by the trial court. *State v. March*, 216 S.W.3d 663, 664 (Mo. banc 2007). However, when an appellant contends that his rights under the Con-

frontation Clause were violated by the admission of evidence, this is a question of law that we review *de novo*. *Id.* at 664–65.

■ The Confrontation Clause prohibits the introduction of testimonial hearsay unless the witness is unavailable and the defendant has had a prior chance to cross-examine the witness. *See State v. Howell*, 226 S.W.3d 892, 896 (Mo.App.2007) (*citing Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004)). However, the Confrontation Clause is not concerned with and does not bar non-testimonial hearsay. *See Davis v. Washington*, 547 U.S. 813, 821 – 824, 126 S.Ct. 2266, 2273–2275, 165 L.Ed.2d 224 (2006); *State v. Kemp*, 212 S.W.3d 135, 149–50 (Mo. banc 2007). Statements that are not made to law enforcement personnel or governmental agents are not testimonial in nature, and Confrontation Clause protection does not extend to those situations, though the law applying to hearsay may be applicable. *See Kemp*, 212 S.W.3d at 150. Girlfriend's statement to Gercone was non-testimonial, and the Confrontation Clause would not operate to exclude it.

■ Having held that there was no violation of the Confrontation Clause, we must still review the admission of Exhibit 18 and the related testimony thereto for abuse of discretion and prejudice. Defendant contends that Exhibit 18 was inadmissible hearsay. A hearsay statement is an out-of-court statement used to prove the truth of the matter asserted, and such a statement is generally inadmissible. *State v. Harrison*, 213 S.W.3d 58, 76 (Mo. App.2006).

---

1. Exhibit 18 consisted of the following brief statement by Gercone.

 After I was done with my dope I walked into the kitchen to clean my spoon. When I walked back into [Defendant]'s bedroom I remember [Girlfriend] complaining about

 her arm where [Defendant] had hit [injected] her.
 She was complaining about [Defendant] fishing around in her arm and her arm hurting.

■ Assuming *arguendo* that Exhibit 18 would ordinarily constitute hearsay, the trial court did not abuse its discretion in admitting it, though it would not fit into any of the regular hearsay exceptions. Defendant opened the door to the admission of Exhibit 18 by his cross-examination of Gercone about Exhibits A and B, his first two written statements. The trial court stated that defense counsel's repeated questioning about Exhibits A and B, hammering home to the jury how short they were and implying that these were the only statements that Gercone made to the police prompted it to admit Exhibit 18. This cross-examination of Gercone entitled the State to introduce Exhibit 18 to show that Gercone in fact gave an additional written statement with additional details even if it would otherwise have been inadmissible. *See State v. Uka*, 25 S.W.3d 624, 627 (Mo.App.2000)); *State v. East*, 976 S.W.2d 507, 511 (Mo.App.1998); *State v. McFall*, 737 S.W.2d 748, 756 (Mo.App. 1987).

Defendant contends that Exhibit 18 should not have been admitted because it was a separate statement from Exhibits A and B, essentially arguing that the trial court erroneously admitted it under the completeness doctrine, citing *State v. Chambers*, 891 S.W.2d 93, 103 (Mo. banc 1994) and *State v. Banks*, 468 S.W.2d 623, 624 (Mo.1971). As noted above, Exhibit 18 was admitted properly because Defendant opened the door to its admission, not because of the completeness doctrine. The trial court did not abuse its discretion in admitting Exhibit 18.

■ Further, assuming *arguendo* that the trial court erred in admitting Exhibit 18, this would not require reversal. Regarding the admission of evidence, this Court reviews for prejudice and not mere error, and we will reverse only if the error was so prejudicial as to deprive the defendant of a fair trial. *State v. Warren*, 141 S.W.3d 478, 491 (Mo.App.2004). We note that McGrael and Baker both testified that Defendant injected Girlfriend twice late at night, once with the oxycontin solution and once with the "wash" from the oxycontin injection. Exhibit 18 and Gercone's testimony regarding it was cumulative to the testimony of McGrael and Baker. "When improperly admitted evidence is merely cumulative to other properly admitted evidence, the admission of the evidence is not prejudicial." *State v. Newlon*, 216 S.W.3d 180, 187 (Mo.App.2007). Even if Exhibit 18 was admitted improperly, there was no prejudice. Point denied.

In his second point relied on, Defendant asserts that the trial court erred in sentencing him as a persistent drug offender because he had been convicted of only one felony that involved a controlled substance, and the second conviction that the trial court used to sentence him as a persistent drug offender was not for a felony involving or related to a controlled substance. Rather, the conviction was for the sale of an imitation controlled substance. Defendant avers that he was prejudiced by being sentenced as a persistent drug offender because this makes him ineligible for probation or parole on his life sentence for distribution of a controlled substance.

Section 195.291.2 RSMo. Cum.Supp. 2004 [2] provides that anyone who has pleaded guilty or been convicted of a violation of section 195.211, when punishable as a class B felony, "shall be sentenced to the authorized term of imprisonment for a class A felony which term shall be served without probation or parole if the court finds that the defendant is a persistent drug offender." Section 195.275.1(2) defines a persistent drug offender as "one who has

---

**2.** Unless noted otherwise, all further statutory citations are to RSMo. Cum.Supp.2004.

previously pleaded guilty to or been found guilty of two or more felony offenses of the laws of the state or of the United States, or any other state, territory or district relating to controlled substances."

Defendant was convicted of a violation of section 195.211 in this case. He had one prior felony conviction that involved a controlled substance. His other felony conviction was for the sale of an imitation controlled substance, which he argues is not a felony conviction "relating to controlled substances."

■■■ There is no definition or case law that explains what "relating to controlled substances" means. When this Court analyzes a criminal statute, it determines the Legislature's intent from language of the statute, and gives effect to that intent. *State v. Daniel,* 103 S.W.3d 822, 826 (Mo. App.2003). We examine the language used in the statute, giving that language its plain and ordinary meaning. *Id.* We particularly look to whether the language is clear and plain to the person of ordinary intelligence. *Id.* When the Legislature has not defined a word, we can examine other legislative or judicial meanings of the word, and can also ascertain a word's plain and ordinary meaning from its definition in the dictionary. According to the dictionary, "relate" means "to have relationship or connection[.]" "[R]elating to controlled substances" would mean having some connection to controlled substances. An imitation controlled substance does have a connection to the controlled substance that it seeks to imitate. Section 195.010(21) defines "imitation controlled substance" as follows:

[A] substance that is not a controlled substance, which by dosage unit appearance (including color, shape, size and markings), or by representations made, would lead a reasonable person to believe that the substance is a controlled

substance. In determining whether the substance is an "imitation controlled substance" the court or authority concerned should consider, in addition to all other logically relevant factors, the following:

(a) Whether the substance was approved by the federal Food and Drug Administration for over-the-counter (nonprescription or nonlegend) sales and was sold in the federal Food and Drug Administration approved package, with the federal Food and Drug Administration approved labeling information;

(b) Statements made by an owner or by anyone else in control of the substance concerning the nature of the substance, or its use or effect;

(c) Whether the substance is packaged in a manner normally used for illicit controlled substances;

(d) Prior convictions, if any, of an owner, or anyone in control of the object, under state or federal law related to controlled substances or fraud;

(e) The proximity of the substances to controlled substances;

(f) Whether the consideration tendered in exchange for the noncontrolled substance substantially exceeds the reasonable value of the substance considering the actual chemical composition of the substance and, where applicable, the price at which over-the-counter substances of like chemical composition sell. An imitation controlled substance does not include a placebo or registered investigational drug either of which was manufactured, distributed, possessed or delivered in the ordinary course of professional practice or research

It is readily apparent that applying the plain and ordinary meaning of "relating" that "imitation controlled substances" do in fact relate to, refer to, and are connected

to controlled substances. We note in particular that one of the relevant factors in determining whether a substance is an "imitation controlled substance" is whether the person in control of the substance has any prior convictions "related to controlled substances[.]" Section 195.010(21)(c). Accordingly, a felony conviction for the sale of an imitation controlled substance is a felony conviction "relating to controlled substances" for the purpose of determining if a defendant is a prior or persistent drug offender under section 195.275.1(2).

 Defendant argues also that the rule of lenity should apply. The rule of lenity give a criminal defendant the benefit of a lesser penalty where a statute is ambiguous and allows for more than one interpretation. *State v. Rowe,* 63 S.W.3d 647, 650 (Mo. banc 2002). If an ambiguity does exist in a criminal statute, it must be construed liberally in favor of the defendant, but this rule does not require this Court to dispense with common sense or disregard an evident statutory purpose. *State v. Stewart,* 113 S.W.3d 245, 249 (Mo. App.2003). There is no ambiguity in section 195.275.1(2). Therefore the rule of lenity is inapplicable. Point denied.

The judgment of the trial court is affirmed.

ROY L. RICHTER, P.J., and GLENN A. NORTON, J., concur.