STATE of Missouri, Plaintiff–
Respondent,

v.

Buddy L. BENNETT, Defendant–
Appellant.

No. 27464.

Missouri Court of Appeals,
Southern District,
Division Two.

April 9, 2007.

**606** ◼ ◼◼◼◼◼◼◼◼◼◼

————

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Lisa M. Kennedy, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

Buddy L. Bennett ("Defendant") appeals the jury conviction of two counts of robbery in the first degree, violations of Section 569.020,[1] one count of armed criminal action, a violation of Section 571.015, burglary in the first degree, a violation of Section 569.160, and assault in the second degree, a violation of Section 565.060. He contends that the trial court abused its discretion in admitting a tape of two 911 calls identifying him as the perpetrator because the tape contained inadmissible hearsay and the admission violated his right to confront and cross-examine the witness against him. We affirm.

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. On October 15, 2004, while Defendant was at the home of his friend, Eric Newton ("Newton"), using marijuana, they talked about getting more drugs. Defendant told Newton that he knew about "some young kids" who lived in Kimberling City, Missouri, "that had a bunch of drugs in their house—marijuana and possibly cocaine." They discussed going to Kimberling City and taking "their

stuff." Defendant told Newton that they were "punk" kids, around the ages of nineteen or twenty, who were vulnerable and weak, and that it wouldn't be very hard to take the drugs from them. He said that he used to be friends with one of the boys, Jason Roberts ("Jason"), but they no longer got along.

After deciding to go to Kimberling City to take the drugs, Defendant and Newton got in a "Lee Plumbing" truck[2] and drove to Galena, Missouri where they picked up Clint Cook ("Cook"). The men packed a pellet gun, two masks, a 12–gauge shotgun, and a revolver in the truck and, using Defendant's directions, drove to the apartment in Kimberling City that they intended to rob.

The apartment in Kimberling City was inhabited by Jeffrey ("Jeffrey") and Deborah ("Deborah") Roberts and their three sons, Jason, age twenty, Jeremy, age fourteen, and Justin, age twelve. The whole family was home on the evening of October 15, 2004, along with a twelve-year-old friend of Justin, and three friends of Jason: Jeremy Banas ("Jeremy"), Josh Molz ("Josh"), and Pat Meeks ("Pat").

Jeffrey left the apartment to go to the grocery store and get some snacks. Shortly after he left, Defendant, Newton and Cook, who were carrying weapons and wearing masks, knocked on the Roberts' front door. When Pat started to open the door the three men pushed their way inside, put a shotgun in Pat's mouth, chipping his tooth, and shoved him down on the couch. Cook, the only intruder not wearing a mask, shoved the shotgun in Deborah's chest telling her that he "knew for a fact that [they] had cashed a check the day before." At that time, Newton

---

**1.** All references to statutes are to RSMo (2000) unless otherwise indicated.

**2.** Newton was employed by Lee Plumbing.

became scared and ran out of the apartment.

Defendant, who was wearing a clown mask, put the pistol he was carrying into Josh's face and told him to empty his pockets. Josh emptied his pockets, which contained a wallet, cigarettes, lighter, and approximately $500 in cash. When Defendant was taking the money Josh noticed he had a tattoo on his hand that said "POW." [3] Defendant then told Jeremy to empty his pockets. Jeremy refused and Defendant hit him in the left ear with the gun, causing a wound that later required stitches. Defendant proceeded to take Jeremy's cell phone.

The two remaining intruders proceeded to move into the bedrooms and go through the Roberts' possessions. They kicked in the bedroom door where the younger boys were playing and rummaged through the boys' dresser drawers. Deborah followed the masked Defendant and Cook into the bedrooms screaming at them because she was afraid for the younger boys. At some point Deborah's cell phone started to ring, she looked at it and saw that it was Jeffery calling so she picked the phone up and started yelling for Jeffery to get home, but she never actually talked to him because Defendant grabbed the cell phone from Deborah and threw it against the wall. Deborah and Defendant argued and scuffled, and at some point Deborah ripped the clown mask off of Defendant and recognized him. Defendant then ran out of the house.

While the Defendant and Cook were still in the apartment, some of the older boys, including Jason, were able to escape. Jason ran to his neighbor's apartment and the neighbor called 911. Jason spoke with the 911 dispatcher and reported the robbery. He hung up the phone and then called 911 again to check to see how close the police were to the apartment.

After Newton left the apartment he threw his gun into a culvert and returned to the truck. A short time later, Cook came running out to the truck and the two of them left the apartment complex without Defendant. Newton and Cook hid the shotgun in a boat at a friend's house and disposed of other items taken from the apartment by throwing them over a bridge and under a trestle.

The next day, Newton received a telephone call from his boss at Lee Plumbing telling him that a detective was at his place of business, that one of his trucks had been involved in a robbery, and that the detective needed to talk to Newton. Newton turned himself in to the detective and eventually told the police that he along with Defendant and Cook had robbed the Roberts' apartment and showed the officers where they disposed of the stolen items and the weapons used in the robbery.

Defendant was charged in a second amended information, as a prior and persistent offender, with two counts of the class A felony of robbery in the first degree; two counts of armed criminal action; one count of the class B felony of burglary in the first degree; and one count of the class C felony of assault in the second degree.

A jury found Defendant guilty on two counts of first degree robbery, one count of armed criminal action, one count of first degree burglary, and one count of assault in the second degree. He was sentenced, as a prior and persistent offender, to twenty years on Count I, first degree robbery, a consecutive term of ten years on Count II, armed criminal action, and concurrent terms of twenty, ten, and five years on

---

**3.** During trial Josh identified the "POW" tattoo on Defendant's hand.

Count III, first degree robbery, Count V, first degree burglary, and Count VI, second degree assault. Defendant now appeals.

Defendant's sole point on appeal is that the trial court erred in admitting the tape of the 911 calls that were made to police during which Jason identified Defendant. In this regard, the jury heard the following exchange that took place between the neighbor, Jason, and the 911 dispatcher:

Dispatcher ("D"): Stone County 911, where is your emergency?

Neighbor ("N"): We need sheriffs at Kimberling Shores.

D: Okay, what's the address?

N: It would be downstairs at [address omitted].

D: Okay, what's going on?

N: Uh, somebody just ran up to my apartment and said that they're robbing it, here, do you want to talk to him?

D: Yeah.

Jason ("J"): [Indistinguishable] they got my little baby brothers . . .

D: Sir?

J: Hello?

D: Hello, which room are you in now?

J: I'm upstairs at the neighbor's.

D: Okay, what's the address there?

J: The Kimberling Shores Apartments.

D: Right, but which number?

J: [address omitted.]

D: Great. Okay what's your name?

J: Jason Roberts

D: Okay, and what happened?

J: They . . . came and kicked in my door with guns.

D: Okay. How many people?

J: Three.

D: Three people, do you know who they are?

J: Buddy. Buddy Bennett's one of them. I don't know the other two.

D: And they all had guns, or just one of them?

J: All three of 'em.

D: Okay. And what'd they take?

J: I don't know what they did. I ran out the house. They've got my mom and my little brothers there. I need to get down there.

D: Your mom and your little brothers are still there?

J: Yeah.

D: Okay, what I need you to do, Jason, is to stay right where you're at and I'm going to get an officer to go over there first. Okay?

J: All right. Bye.

D: Okay, and they're in [address omitted]? Jason? They're in [address omitted]?

J: Yeah.

D: Okay—

J: —I need to call my dad.

D: Jason, listen to me. Which one are you in?

J: I don't know what apartment I'm in but I need to go down there.

D: No—

J: They got my little brothers.

D: Okay, Jason, you're not going down there. I'm sending a deputy down there. You're gonna stay right where you're at.

J: I need to call my dad and let him know, he's at the gas station, before he goes in there.

D: Okay, go ahead and do that but I want you to stay where you're at.

J: All right, bye.

[end of call.]

Jason then made a second 911 call to determine how close the police were to the

apartment. That call was also admitted into evidence and the jury heard the following conversation:

D: Stone County 911, where is your emergency?

J: Yeah, I just called earlier. I was wondering how close the cops are?

D: Okay. Sir, they're staging right now. They're waiting till they get some more backup. They're gonna be, they're right outside the area. So it's not going to be very long.

J: Did they get a hold of my mom?

D: Huh?

J: Did they get a hold of my mom?

D: Let me check with the other operator and see if she did okay? Hold on just a moment.

J: All right.

D: Okay. She said the cell phone's been turned off.

J: Uh ... I have two little brothers ... and his little friend there ...

D: Okay. Everything's going to be fine.

J: I'm afraid they hurt my mom.

D: I don't think they're going to hurt your mom.

J: You guys know who Buddy Bennett is right? I know that he's one of them ... I don't know the others ...

D: I don't know who he is, but I'm sure the officers are aware of him.

[Part of tape where Jason states that Defendant is on parole is edited out and was not played to jury.]

J: He used to be my next door neighbor.

D: Okay. We're going to keep trying the cell phone and see if they can get a hold of her, okay?

J: My dad's is [phone number omitted], and he ain't home yet, so can you guys call and let him know what's going on?

D: No. I don't need any more people there than what we've already got.

J: He's coming home from the grocery store. He might walk right into it.

D: Well, somebody will secure the scene out there. They will not let any people go in there. The officers won't. That's why we've got so many people going. Okay?

J: All right. All right.

D: Just remain there where you are, and wait till an officer makes contact with you, okay?

J: They might be gone—they might be gone by now. They might already be gone by now.

D: Do you have any ...

J: ... they come knocking on the door ... when they come have them knock on the door so they don't scare my little brothers ... if they're already gone ...

D: Alright ... they know what they're doing. Are there any weapons in your house where your brother and your mom are?

J: No, we have no weapons.

D: Okay. All right. They should be there just shortly, okay?

J: All right. I hope so.

D: All right.

J: Bye

D: Hey.

J: Huh.

[call ends.]

In *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007), the Supreme Court of Missouri held that for a 911 tape to be properly admitted two evidentiary hurdles need to be cleared. "First, the statements must survive traditional hearsay analysis. Second, because this is a criminal case, the statements must survive Sixth Amendment Confrontation Clause analysis." *Id.* We

interpret Defendant's point on appeal as challenging both evidentiary hurdles.

## Hearsay Analysis

■ Defendant argues that the trial court erred in admitting the statements on the 911 tape over his objections because they constituted inadmissible hearsay.

A trial court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion. [T]hat discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Additionally, on direct appeal, this Court reviews the trial court for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial.

*Id.* at 145–146.

■ Hearsay statements are out-of-court statements that are used to prove the truth of the matter asserted and depend on the veracity of the statement for its value. *Id.* at 146. In this case, Jason did not testify at trial, but his statements as to the identity of Defendant and aspects of the robbery were introduced through the conversation he had with the 911 dispatcher. These were out-of-court statements used to prove the truth of the matter asserted: that Defendant was one of the three men who committed criminal offenses at the Roberts' apartment. Therefore, the statements made on the 911 tape are hearsay.

■ Though the statements on the 911 call are hearsay, they are admissible if they fall under one of the exceptions to the general rule against hearsay. The trial court admitted Jason's statements on the 911 tape under the excited utterance exception. "The **excited utterance** exception to the rule against hearsay applies when: (1) a startling event or condition occurs; (2) the statement is made while the declarant is still under the stress of the excitement caused by the event and has not had an opportunity to fabricate the story; and (3) the statement relates to the startling event." *State v. Hedges*, 193 S.W.3d 784, 788 (Mo.App. E.D.2006). Excited utterances are inherently trustworthy because "the startling nature of the event is speaking through the person instead of the person speaking about the event." *Kemp*, 212 S.W.3d at 146 (quoting *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 122 (Mo. banc 1995)). Because of the shock produced by the event an excited utterance may be taken as expressing the true belief of the declarant. *Kemp*, 212 S.W.3d at 146.

In this case, Jason's statements to the 911 dispatcher were admissible under the excited utterance exception. Jason had just witnessed three armed men break into his apartment and assault and steal from individuals in the apartment. This clearly qualifies as a "startling event." His statements were also made while he was still "under the stress of the excitement caused by the event." He had just fled from the apartment and immediately had a neighbor call 911. As he was making the statements to the 911 dispatcher he believed the event was still ongoing and his comments and tone of voice indicate that he was under a great deal of stress worrying about his mother and siblings that remained in the apartment along with the intruders. He was out of breath and often indicated that he needed to "get down

there" to the apartment because his mother and brothers were still with the armed men. Finally, all of Jason's statements "relate[ed] to the startling event." He described what had happened. He told the 911 dispatcher that Defendant was one of the three intruders and that they had "kicked in my door with guns," and that the intruders "got my mom and my little brothers there" in the apartment.

These statements, and Jason's behavior and tone of voice, leave no doubt that while talking with the 911 dispatcher Jason was under the "immediate and uncontrolled domination of the senses as a result of the shock produced by the event." *Kemp,* 212 S.W.3d at 147 (quoting *State v. Strong,* 142 S.W.3d 702, 718 (Mo. banc 2004)). Therefore, these statements can be taken as expressing the true belief of Jason.

The trial court did not abuse its discretion in admitting the statements contained in the 911 tape because they qualify as excited utterances.[4]

### Confrontation Clause Analysis

■ Defendant also argues that the trial court erred in admitting the statements on the 911 tape because such admission violated his right to confront and cross-examine the witness against him, guaranteed by the Sixth Amendment. While similar to the hearsay analysis this is a separate and distinct evidentiary analysis.

■ Defendant did not object to the admission of the 911 tape on the ground that it violated his Sixth Amendment right to confront the witness. As such, he failed to raise his constitutional challenge to the admission at the first opportunity. "To

preserve appellate review, constitutional claims must be made at the first opportunity, with citations to specific constitutional sections." *State v. Hall,* 982 S.W.2d 675, 681 (Mo. banc 1998) (quoting *State v. Chambers,* 891 S.W.2d 93, 103–04 (Mo. banc 1994)). However, where the constitutional claim was not raised at the first opportunity this court has discretion to review for plain error. *State v. Baxter,* 204 S.W.3d 650, 652 (Mo. banc 2006). Plain error occurs when the court finds that a manifest injustice or miscarriage of justice has resulted. *Id.* It can serve as a basis for granting a new trial on direct appeal only if the error was outcome determinative. *Id.* "Manifest injustice is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice." *Id.*

The Confrontation Clause states, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend VI. The Supreme Court of the United States in *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The court in *Crawford* did not specifically define the term "testimonial statements," but instead gave various formulations of the core class of testimonial statements. *Id.* at 51–52, 124 S.Ct. 1354. Defendant now argues that Jason's statements to the 911 dispatcher were testimonial and therefore,

---

4. The 911 tape is itself hearsay because it is being offered for the truth of the matter asserted, that this was what was actually said in the 911 call. No objection at trial was made on this ground and it is not challenged on appeal. We note in passing that the State

offered sufficient evidence of the business operations and methods of record-keeping for 911 calls for the tape to qualify under the business records exception. *See State v. Edwards,* 31 S.W.3d 73, 77–78 (Mo.App. W.D. 2000).

their admission, absent Jason testifying, violated his right to confront the witnesses against him.

Whether statements made in 911 calls are considered testimonial for purposes of Confrontation Clause analysis has been addressed by the Supreme Court of the United States in *Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court of Missouri in *State v. Kemp,* and our Western District in *State v. Cannon,* 215 S.W.3d 295 (Mo.App. W.D.2007). The *Davis* court used a test, which has been adopted and applied by the Missouri courts, to determine whether statements made in the course of a 911 call implicate the Confrontation Clause.

The *Davis* court held as follows:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

126 S.Ct. at 2273–74. The issue then becomes whether Jason's statements and answers to the 911 dispatcher's questions, objectively considered, was an interrogation to "enable police assistance to meet an ongoing emergency" or an interrogation to "establish or prove past events potentially relevant to later criminal prosecution." *Id.; Kemp,* 212 S.W.3d at 148.

The circumstances surrounding the two 911 calls clearly indicate that the questions of the 911 dispatcher were designed to help the police and Jason deal with an ongoing emergency. Jason had just escaped from his apartment where three armed men had broken in and assaulted the apartment's occupants. The first thing Jason said to the 911 dispatcher was "they got my little baby brothers." Throughout both calls Jason was worried about his brothers and mother who were still in the apartment with the three armed intruders. The 911 dispatcher's questions were aimed at ascertaining what the situation was like and where it was taking place. She also had to continually tell Jason not to go back to the apartment where he believed the three armed intruders still had his mother and brothers.

Even during the second 911 call the emergency was ongoing. Jason called to see "how close the cops are" and ask if the cops had got "a hold of my mom." He told the dispatcher he was "afraid [the intruders are] going to hurt my mom." At the end of the second call the police still had not arrived and Jason and the 911 dispatcher had no idea whether the three armed men were still in the apartment or whether they had left. The 911 dispatcher told Jason to "remain there where you are, and wait till an officer makes contact with you." Jason said, "they might already be gone by now."

Viewed objectively, both 911 calls show that the 911 dispatcher's questions and Jason's answers was an interrogation conducted to enable police assistance to meet an ongoing emergency. Therefore, these statements were nontestimonial and the Confrontation Clause does not prohibit their admission. *Kemp,* 212 S.W.3d at 149.

Defendant, however, asserts that it was unnecessary for Jason's statements regarding Defendant's identity be left on the tape that the jury heard. This argument is without merit.

In *Davis, Kemp,* and *Cannon,* the 911 tapes admitted had specific references to

the defendant's identity. In all three cases, the court concluded that a 911 dispatcher's attempt to determine an assailant's name was directed at resolving the present emergency. Specifically an "operator's effort to establish the identitiy of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon," are nontestimonial. *Davis,* 126 S.Ct. at 2276. Therefore, the trial court did not need to edit out specific references to Defendant's identity.

The trial court did not commit plain error when it admitted a tape of the two 911 calls because the statements contained on the tape were nontestimonial and, therefore, did not implicate the Confrontation Clause.

## Conclusion

The trial court did not abuse its discretion in admitting the tape of two 911 calls containing statements by Jason because such statements qualified under the excited utterance exception to hearsay. Further, it was not plain error under the Confrontation Clause to admit the 911 calls because the statements contained within were nontestimonial.

The judgment of the trial court is affirmed.

BARNEY, and LYNCH, JJ., concur.