**STATE of Missouri, Respondent,**

v.

**Fred L. BYNUM, Appellant.**

**No. ED 92157.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Nov. 24, 2009.

Alexandra E. Johnson, St. Louis, MO, for Appellant.

Christopher Koster, James B. Farnsworth, Assistant Attorney General, Jefferson City, MO, for Respondent.

ROY L. RICHTER, Judge.

Fred Bynum ("Defendant") appeals the judgment and sentence entered upon a jury verdict finding him guilty of three counts of statutory sodomy in the first degree, three counts of attempted statutory sodomy in the first degree, and two counts of sexual misconduct involving a child. The trial court found Defendant to be a prior and persistent offender and sentenced him to two consecutive life terms imprisonment on Counts I and II for statutory sodomy in the first degree, and one concurrent life term for Count

VII, sexual misconduct involving a child. The court sentenced Defendant to five concurrent terms of fifteen years imprisonment for the remaining five charges, Counts III, IV, VI, VIII and IX. We affirm in part and remand in part for resentencing on the two convictions for sexual misconduct involving a child.

## I. BACKGROUND

The State charged Defendant with three counts of statutory sodomy in the first degree (Counts I, II, and VIII), in violation of section 566.062 RSMo 2000[1], three counts of attempted statutory sodomy in the first degree (Counts III, IV, and IX), in violation of section 566.062, and two counts of sexual misconduct involving a child (Counts VI and VII), in violation of section 566.083.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions.

Defendant testified at trial and stated that in March 2004 he moved in with his niece, N.B. ("Mother"), and her two daughters, W.B. and K.B., then ages eight and seven, because Mother needed help paying her bills and because she lived near Defendant's work. Defendant moved out of Mother's residence in August 2004 when he was arrested for violating his parole.

At trial the State presented evidence that Defendant had perpetrated a series of sexually abusive acts against W.B. and K.B., his two grandnieces, between March and August of 2004 during the time he lived at Mother's home.

Defendant denied sexually abusing the girls and argued that their allegations had been inconsistent. Citing information contained in a Children's Division hotline report, Defendant argued that Mother and the girls had initially named Walter By-

---

1. All further statutory references are to RSMo (2000).

num, Jr. ("Walter"), Defendant's nephew and Mother's brother, as the actual perpetrator.

In support of his position Defendant first offered the testimony of Dr. Manohara Munimuddappa ("Dr. Munimuddappa"), the pediatrician who examined W.B. on February 23, 2005. As a physician, Dr. Munimuddappa is a mandated reporter and required to report allegations of abuse or neglect to the Children's Division. According to Dr. Munimuddappa, Mother brought in W.B. due to "suspected molestation by child's uncle." Dr. Munimuddappa testified that W.B. identified the alleged perpetrator, though he could not remember if she provided the perpetrator's name. When asked whether he relayed W.B.'s identification to Children's Division in his hotline report, Dr. Munimuddappa replied:

> That is what I think I did, because I didn't write the name here; but according to the child and also the mother, it was child's uncle. And I might have told the name of the person to this lady by name of Miss Snow [sic]. She is from Department of Family Services.

Defendant then offered testimony from Leslie Brown ("Ms. Brown"), a representative from Children's Division, concerning the hotline report that Dr. Munimuddappa's call generated. The Children's Division's record of the doctor's hotline call identifies Walter, not Defendant, as the alleged perpetrator of the abuse. The record also contains Walter's birth date and social security number.

The State, however, elicited testimony from Ms. Brown on cross-examination regarding a Children's Division process called "matching," wherein the person receiving a hotline call attempts to fill in as much information as possible about a potential perpetrator. Using the Children's Division's database, the operator may record information regarding a particular hotline call that does not come from the caller, but rather from information that has previously been entered into the system. The State, in essence, argued that the hotline operator, rather than Dr. Munimuddappa, had identified Walter as the potential perpetrator based on a "match" that surfaced in the system. Ms. Brown acknowledged that the database-generated "matches" are not always correct; that sometimes the hotline operator initially identifies the wrong potential perpetrator based on an erroneous "match."

Ms. Brown also acknowledged, after examining the hotline report, that Dr. Munimuddappa—the reporter—had not provided any information about the alleged perpetrator other than to state that it was W.B.'s uncle.

Dr. Munimuddappa's cross-examination testimony corroborated Ms. Brown's statements. He testified that he could not recall what information he had given the hotline operator, but noted that he had not included the alleged perpetrator's name, birth date, or social security number in his notes. Dr. Munimuddappa reaffirmed that the name "Uncle Walter" did not appear anywhere in his notes.

W.B. and K.B. both testified at trial and identified Defendant, whom they referred to as "Uncle Fred[2]," as the man who had sexually abused them.

On cross-examination the defense attempted to show that the girls had many uncles and consequently were confused about which one had perpetrated the abuse. Defense counsel's questions insinu-

2. Thought Defendant is technically the girls' great uncle, they did not make this distinction.

ated that Walter, not Defendant, had abused them. In cross-examining W.B., the defense asked if she had an Uncle Walter to which she replied, "yes." When counsel asked W.B. whether Uncle Walter had been to her house she said she was not sure. Finally, when asked if she had ever stayed at Uncle Walter's house, W.B. answered "no."

Similarly, defense counsel asked K.B. if she had other uncles besides Defendant who came to her house and she answered "yes." When asked if Uncle Walter in particular came to her house K.B. also replied "yes." Defense counsel finally asked K.B. if she remembered W.B. telling their parents that Uncle Walter was the person who did bad things to her. K.B. answered "no."

On redirect, the State asked K.B. which uncle did bad things to her and she said "[Defendant]."

The jury returned a guilty verdict on all eight counts. The trial court found Defendant to be a prior and persistent offender and sentenced him to two consecutive life terms imprisonment on Counts I and II for statutory sodomy in the first degree, and one concurrent life term for Count VII, sexual misconduct involving a child. The court sentenced Defendant to five concurrent terms of fifteen years imprisonment for the remaining five charges, Counts III, IV, VI, VIII and IX.[3]

Defendant appeals.

## II. DISCUSSION

█ In his first two points on appeal Defendant argues that the trial court plainly erred and exceeded its jurisdiction in sentencing him to fifteen years and life in prison on Counts VI and VII, respectively, for sexual misconduct involving a child. Defendant claims that the maximum penalty constituted seven years' imprisonment on each count. The State concedes Defendant's points, and we agree.

█ Defendant acknowledges that he is entitled to plain error review only because he did not present his objections to the trial court: Defendant did not object at sentencing or in his motion for a new trial. *See State v. Johnson*, 220 S.W.3d 377, 383 (Mo.App. E.D.2007). Plain error review "requires this Court to find that manifest injustice or a miscarriage of justice resulted from the trial court error." *State v. Holden*, 278 S.W.3d 674, 680–81 (Mo. banc 2009) (citing Rule 30.20). "Where it appears that a defendant has been improperly sentenced as a prior or persistent offender, plain error review is appropriate." *State v. Manley*, 223 S.W.3d 887, 892 (Mo. App. W.D.2007). We will therefore review points one and two for plain error.

Defendant was charged with two counts of sexual misconduct involving a child in violation of section 566.083. Sexual misconduct involving a child constitutes a class D felony for which the maximum prison term remains four years' imprisonment. *See section* 566.083.3 RSMo 2000 (defining sexual misconduct involving a child as a class D felony "except that the second or any subsequent violation of this section is a class C felony")[4]; *see also section* 558.011.1(4) (stating that prison term for class D felony is not to exceed four years). The trial court sentenced Defendant as a prior and persistent offender

---

3. The State nolle prosequied Count V, child molestation in the first degree, prior to trial.

4. The Legislature revised section 566.083 effective August 2004. H.B. 1055, Gen. Assem., 2d Reg. Sess. (Mo.2004); section 566.083.4. The revision took place after Defendant committed the charged offenses. The State and Defendant agree that he has never pleaded guilty to or been convicted of sexual misconduct involving a child.

and therefore his punishment could have been enhanced from four years to seven under section 558.016.7(4). The trial court, however, inexplicably sentenced Defendant to fifteen years and life in prison on Counts VI and VII, respectively.

A sentence which is in excess of that authorized by law is beyond the authority of the sentencing court. *State v. Kimes*, 234 S.W.3d 584, 590 (Mo.App. S.D. 2007) (quoting *Manley*, 223 S.W.3d at 892–93); *State v. Young*, 230 S.W.3d 30, 34–35 (Mo.App. E.D.2007). Defendant will suffer a manifest injustice as result of a sentence that exceeds the statutory maximum. *Kimes*, 234 S.W.3d at 590; *State v. Hooper*, 801 S.W.2d 717, 721 (Mo.App. S.D. 1990).

The trial court exceeded its jurisdiction and committed plain error when it sentenced Defendant to fifteen years and life in prison on Counts VI and VII, respectively. The sentences on these two counts are remanded for resentencing only.

In his third point on appeal, Defendant argues that the trial court plainly erred and abused its discretion in admitting Mother's 911 call into evidence. We disagree.

The following additional facts are relevant to this point. The State called police officer John Clobes as a rebuttal witness and used his testimony to introduce a 911 call that Mother made on February 18, 2005.[5] During the call Mother informed the 911 operator that she had just learned that her daughter W.B. had been raped by an uncle who was incarcerated at that time.[6] The jury heard the following exchange between Mother and the 911 operator during her 911 call:

Operator: 911 call

Mother: Yes, I'm calling to uh . . . what number do I call for .. uh . . . my daughter? I just found out that my daughter was raped.

Operator: Okay, so this incident has not been reported?

Mother: No I'm just finding out tonight.

Operator: Okay we can go ahead and . . . is your daughter with you now?

Mother: Yes she's with me now.

Operator: How old is she?

Mother: She's nine.

Operator: Okay. And the person who did this is not on the scene, correct?

Mother: Right. *He's incarcerated . . .* (unintelligible)

Operator: How long ago was that?

Mother: About, let's see . . . about . . . I think 6 or 7 . . . I mean it's been awhile.

Operator: Okay.

Mother: But I think what made her come out with it, I guess they had like a thing at school.

Operator: I see.

Mother: (unintelligible) . . . *talking about a thing with my brother.*

Operator: *And it was her uncle that did this?*

Mother: *Yes.*

Operator: Okay and you said he's incarcerated. Do you know where?

Mother: I don't know where he is . . . (unintelligible)

[The remainder of the discussion was aimed at discerning Mother's whereabouts in order to send an officer to speak with her.]

Mother did not testify at trial, though she was available. We note that Mother

---

**5.** Mother called 911 five days before she took W.B. to Dr. Munimuddappa.

**6.** Defendant was incarcerated when Mother made the 911 call.

did not provide the alleged perpetrator's name to the 911 operator. The call, furthermore, appears to support Defendant's claim that Mother initially implicated her brother, Walter, rather than Defendant because Mother tells the operator she is "talking about a thing with [her] brother." However, the call also implicates Defendant because Mother states that the perpetrator is incarcerated and Defendant remained incarcerated at the time of the call. Mother's statements are ambiguous insofar as she identifies the offender as W.B.'s "uncle:" W.B. referred to Defendant as her "uncle" throughout the proceedings, despite the fact that he is her great uncle. Walter, Mother's brother, is actually W.B.'s uncle.

Defense counsel did not receive a copy of the 911 tape until 11:30 a.m. on the morning of trial and objected to its admission on the basis that it had not been properly disclosed through discovery. Defense counsel argued that the State had ample notice of the tape and the ability to discover it earlier because, "we provided discovery to the State that included the fact that [Mother] had made a phone call to the police on February 18."

The State argued that it did not possess the 911 tape before trial and that it disclosed the tape to defense counsel as soon as the State's investigator discovered it. According to the State, it did not uncover the tape earlier because it did not believe the tape was relevant to its case. The State only began to search in earnest for the tape when it heard the defense's theory in opening statement that Walter, and not Defendant, raped W.B. At that point, the State claimed it needed the contents of the 911 tape in order to counter the defense's claims that the victims had made inconsistent allegations. The State, in essence, believed the 911 tape served to rebut the defense's theory of the case. As

discussed above, however, the contents of the tape belie the State's belief because Mother's identification on the tape remains ambiguous, at best.

After stating her objection, defense counsel admitted that she knew before trial that Mother had called the police on February 18, 2005. Defense counsel also acknowledged that she had made no effort to obtain the tape prior to trial. The trial court then overruled Defendant's objection and allowed the tape to play to the jury.

Defendant offers multiple reasons why the 911 tape was not admissible in evidence. He first argues that it is inadmissible hearsay and violated his Confrontation Clause rights.

Defendant, however, did not object to the tape on either of these bases at trial. He raises the hearsay objection for the first time on appeal, and first objected on Confrontation Clause grounds in his motion for a new trial. He therefore has not properly preserved these objections for review and we may examine them for plain error only. *State v. Holden*, 278 S.W.3d 674, 680–81 (Mo. banc 2009); *Strong v. State*, 263 S.W.3d 636, 646 (Mo. banc 2008) (stating that a constitutional claim must be raised at the earliest opportunity and preserved at every step of the judicial process). Plain error "requires this Court to find that manifest injustice or a miscarriage of justice resulted from the trial court error." *Holden*, 278 S.W.3d at 680–81; *State v. Salter*, 250 S.W.3d 705, 713 (Mo. banc 2008).

 Defendant is correct in that, for a 911 tape to be admissible, it must clear two hurdles. "First, the statements must survive traditional hearsay analysis. Second, because this is a criminal case, the statements must survive Sixth Amendment Confrontation Clause analysis." *State v. Bennett*, 218 S.W.3d 604, 609–10 (Mo.App.

S.D.2007) (citing *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007)). *See also State v. Cannon*, 215 S.W.3d 295, 302 n. 1 (Mo.App. W.D.2007).

■■■ "Hearsay statements are out-of-court statements that are used to prove the truth of the matter asserted and depend on the veracity of the statement for its value." *Bennett*, 218 S.W.3d at 610 (quoting *Kemp*, 212 S.W.3d at 146). Not all out-of-court statements, however, constitute hearsay. If the statement is not offered for the truth of the matter asserted, it does not constitute hearsay and need not fit within an exception to the hearsay rule. *State v. Tyra*, 153 S.W.3d 341, 346 (Mo.App. S.D.2005).

■■ The Confrontation Clause provides that a defendant has the right to confront witnesses against him or her. *State v. Davidson*, 242 S.W.3d 409, 416 (Mo.App. E.D.2007). It further requires a court to exclude all testimonial evidence unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.*; *State v. March*, 216 S.W.3d 663, 665 (Mo. banc 2007) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

We believe that both the State's and Defendant's arguments are flawed with respect to the 911 tape. The State's argument—that the call refutes Defendant's theory of the case and proves that Mother and W.B. consistently accused Defendant—remains implausible because the call is weak evidence in this respect. As discussed previously, Mother's call implicates Walter as much, if not more so, than Defendant: Mother refers to her brother—Walter—and W.B.'s uncle—also Walter—

in the call. The only reference to Defendant remains her statement that the perpetrator was incarcerated.[7] Defendant's argument is flawed for these very same reasons. The defense cannot claim that the State introduced the call for the truth of the matter asserted—that Defendant raped W.-B.—when Mother does not mention Defendant by name on the tape and in fact hardly references him at all.

■■ Normally, we would first analyze whether the 911 call constituted inadmissible hearsay. We do not believe it necessary to make that determination under the circumstances of this case, however, because the tape's admission did not prejudice Defendant. It remains well-established that we will not reverse a trial court simply for erroneously admitting evidence. *State v. Douglas*, 131 S.W.3d 818, 824 (Mo.App. W.D.2004); *State v. Nabors*, 267 S.W.3d 789, 795 (Mo.App. E.D.2008). Rather, the defendant must prove that the evidence's admission prejudiced him. *Nabors*, 267 S.W.3d at 795. In order to show prejudice, Defendant must demonstrate that the error proved outcome-determinative. *Id.* The Missouri Supreme Court addressed outcome-determinative prejudice in *State v. Barriner*:

> A finding of outcome-determinative prejudice "expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence."

34 S.W.3d 139, 150 (Mo. banc 2000) (quoting *State v. Roberts*, 948 S.W.2d 577, 592

**7.** Neither party adduced evidence at trial regarding whether Walter was also incarcerated at that time.

(Mo. banc 1997)). Thus, "the question is whether the evidence had an effect on the jury's deliberations to the point that it contributed to the result reached." *Id.*

We primarily do not believe the tape was outcome-determinative because, as discussed above, its contents are ambiguous and inconclusive, at best, regarding Defendant's guilt. Furthermore, to the extent that it did implicate Defendant, the record contains ample additional, properly-admitted evidence regarding Defendant's guilt: W.B. and K.B. testified at trial and identified Defendant as the perpetrator. The jury also viewed the children's video-taped interview with a specialist from the Children's Advocacy Center wherein they accused Defendant and recounted the same details regarding the sexual abuse. The State also proffered a logical explanation as to why Walter's name initially appeared on the Children's Division hotline report.

Finally, the 911 call did not inject any new evidence regarding Defendant's guilt that had not already been introduced through W.B.'s and K.B.'s testimony. "A defendant is not prejudiced by hearsay testimony that is merely cumulative of evidence already before the trial court, especially if that evidence was presented by another witness who was subject to cross-examination." *State v. Atkeson,* 255 S.W.3d 8, 11 (Mo.App. S.D.2008).

Turning to Defendant's Confrontation Clause argument, we agree with Defendant that Mother's statements on the call are testimonial. *See Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (defining testimonial statements as those made when there is no ongoing emergency, and when the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution). Mother, though available, did not testify at trial and Defendant did not have a prior opportunity to cross-examine her. Thus, if we assume for the sake of argument that the 911 call constituted hearsay, its admission violated Defendant's Confrontation Clause rights. *See Davidson,* 242 S.W.3d at 417.

Constitutional errors, however, do not require reversal if the error was harmless beyond a reasonable doubt. *Id.* For error to be harmless beyond a reasonable doubt, "we must find that no reasonable doubt exists that the admitted evidence failed to contribute to the jury's verdict." *Id.; State v. March,* 216 S.W.3d 663, 667 (Mo. banc 2007).

We believe the violation of Defendant's Confrontation Clause rights constituted harmless error. As discussed above, the record contains ample evidence from which the jury could have found Defendant guilty beyond a reasonable doubt. This case, therefore, is easily distinguishable from one like *March,* wherein the erroneously-admitted lab report harmed the defendant because it was "essentially the only evidence offered" to prove defendant's guilt. *Id.* at 667.

The trial court did not plainly err in admitting Mother's 911 call because the evidence was not outcome-determinative. Furthermore, its admission constituted harmless error since it did not contribute to the jury's verdict.

Defendant next argues that the trial court abused its discretion in refusing to exclude the tape as a discovery sanction.[8] According to Defendant, the State's late-hour disclosure violated the State's Brady [9]

---

8. Defendant objected on this basis at trial and included the objection in his motion for a new trial. He therefore has properly preserved it for review. Rule 78.07(a).

9. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct.

obligation to disclose material evidence as well as the disclosure requirements set forth in Rule 25.03. We disagree.

 The determination of whether the State violated a rule of discovery is within the sound discretion of the trial court. *State v. Delancy*, 258 S.W.3d 110, 115 (Mo.App. E.D.2008); *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981). The remedy, likewise, remains within the trial court's sound discretion. *Delancy*, 258 S.W.3d at 115. The trial court abuses its discretion when the fashioned remedy results in fundamental unfairness to the defendant. *Id.* Fundamental unfairness arises when there is a "reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial." *Id.* (quoting *State v. Scott*, 943 S.W.2d 730, 735–36 (Mo.App. W.D.1997)).

 *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) holds that the prosecution violates due process when it suppresses evidence that is *favorable to the accused* and material to either guilt or punishment. *State v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008) (emphasis added). The 911 tape was not favorable to Defendant. According to the State, the tape proved that the victims had consistently accused Defendant of perpetrating the sexual abuse. More importantly, *Brady* applies only to those situations where the defense discovers information after trial that the prosecution knew at trial. *Id.* If the defendant had knowledge of the evidence at trial, the State cannot be faulted for nondisclosure. *Id.*

The record reveals that defense counsel knew at trial that Mother had called 911 on February 18. The transcript reveals that the following discussion took place

between the parties, off the record, regarding the admissibility of the tapes:

> Defense Counsel: And, Judge, we provided discovery to the State that included the fact that [Mother] had made a phone call to the police on February 18. [ . . . ]
>
> The Court: Had the State subpoenaed those tapes?
>
> Defense Counsel: Pardon me?
>
> The Court: You knew that [Mother] had made a 911 call?
>
> Defense Counsel: We knew that she had contacted the police on February 18th, according to medical records.
>
> The Court: Had you requested anything from the police department regarding that tape?
>
> Defense Counsel: No.

Defendant cannot claim unfair surprise with regards to a tape of which he had knowledge prior to trial yet chose not to locate.

 Defendant also alleges that the State's tardy disclosure violated Rule 25.03. Defendant's argument on this point—that the State "ambushed" him with a piece of evidence he knew nothing about—remains untenable because he knew about the 911 call prior to trial. Regardless, Defendant could have requested the less-drastic remedy of a continuance as an alternative to the tape's exclusion. "A defendant's failure to ask for a continuance 'can be properly considered by the appellate court in determining whether the trial court abused its discretion.'" *State v. Candela*, 929 S.W.2d 852, 869 (Mo. App. E.D.1996) (quoting *State v. Enke*, 891 S.W.2d 134, 138 (Mo.App. S.D.1994)). Moreover, "[o]nce surprise has occurred, the proper remedy is to request a continuance or postponement." *State v. Brass*, 781 S.W.2d 565, 566 (Mo.App. E.D.1989).

1194, 10 L.Ed.2d 215 (1963).

Finally, appellate courts will intervene in discovery matters only where the defendant shows that the failure to make a timely disclosure resulted in fundamental unfairness. *State v. Jamison*, 163 S.W.3d 552, 557 (Mo.App. E.D.2005). As already discussed, the 911 call contained cumulative evidence. Insofar as the tape implicated Defendant, W.B. and K.B. had already testified at trial and identified Defendant as the perpetrator. Furthermore, the jurors viewed W.B.'s and K.B.'s interviews with the advocate at the Child Advocacy Center. Thus, if there were any violation of the discovery rules, which we do not find, such violation did not result in fundamental unfairness because the record contains much more incriminating evidence regarding Defendant's guilt.

In summary, the 911 call was not favorable to Defendant and its introduction did not influence the outcome of the case. Though Defendant knew about the call prior to trial, his proper remedy in the event of surprise was to request a continuance. For these reasons, the trial court did not plainly err or abuse its discretion in admitting Mother's 911 call as rebuttal evidence. Point three is denied.

### III. CONCLUSION

The judgment of the trial court is affirmed in part and remanded in part. The judgment is remanded for resentencing only on Counts VI and VII, sexual misconduct involving a child, in accordance with this opinion. The remainder of the judgment is affirmed.

KURT S. ODENWALD, P.J., and GEORGE W. DRAPER III, J., concur.