

# Missouri Court of Appeals

## Southern District

### Division Two

STATE OF MISSOURI, )
)
        Respondent, )
)
  vs. ) No. SD34066
) Filed: August 4, 2016
DONALD DIXON, )
)
        Appellant. )

APPEAL FROM THE CIRCUIT COURT OF OZARK COUNTY

Honorable R. Craig Carter, Circuit Judge

**<u>AFFIRMED</u>**

Donald Dixon ("Dixon") appeals the judgment of the trial court following his conviction of the class C felony of burglary in the second degree. Following a bench trial, the trial judge sentenced Dixon to seven years' incarceration, suspended execution of the sentence, and ordered a 120-day term of shock incarceration with five years' supervised probation. Dixon challenges the judgment of the trial court in four points on appeal. Finding no merit to Dixon's points, we affirm the judgment of the trial court.

**Factual and Procedural Background**

Dixon challenges the sufficiency of the evidence to support his conviction. "When judging the sufficiency of the evidence to support a conviction, appellate courts . . . accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict and ignore all contrary evidence and inferences." *State v. Wooden*, 388 S.W.3d 522, 527 (Mo. banc 2013). These principles guide our recitation of the facts in this matter.

Prior to October 17, 2014, Dixon and Catherine Dixon ("Catherine")[1] had a turbulent five-year marriage. Dixon had physically assaulted Catherine, stole the key to her vehicle, and surreptitiously entered Catherine's residence while she was sleeping by jimmying the door open with a credit card.

Due to disquiet in the marriage, Catherine often stayed at the home of Linda Angelo ("Angelo"), a nearby neighbor and friend. Dixon would yell across the street at Angelo, threatening her, and went so far as to threaten to burn down her house. On October 17, 2014, Catherine had been living with her daughter in her daughter's house located directly across the street from Angelo. The daughter had recently moved out prior to the events of October 17, 2014, and Catherine was living there alone.[2] A few days prior to October 17, 2014, Dixon circled the house on a motorcycle in an apparent attempt to harass and intimidate Catherine. On October 15, 2014, Angelo and Catherine both obtained ex parte orders of protection against Dixon.

At around 3:30 a.m. on October 17, 2014, Dixon parked his car some distance from Catherine's daughter's house, and walked to the back of the house. He took off his boots and

---

[1] Because a portion of the involved parties share the same surname, for ease of reference, we refer to the parties individually by their first names. We mean no familiarity or disrespect.

[2] Dixon claimed in his testimony that he and Catherine were working together to get the house ready to rent, and that he had been in the house many times. However, our standard of review requires that we disregard this evidence. *See Wooden*, 388 S.W.3d at 527.

climbed on a bucket to gain access to the kitchen window. He propped open the window with a screwdriver, and entered the house. Outside the house, he left a large logging chain with a "big knot" at one end, duct tape, and bolt cutters.

Dixon made his way into the bedroom where Catherine was sleeping. He stopped at the head of the bed, shouted "hey," and then said "Dont [sic] Fucking Move." He screamed obscenities at Catherine, threatened her, and asked if she "went to the cops." Dixon demanded that Catherine leave with him, stating he had a truck parked about three miles away. Dixon also threatened to "burn" her and the neighbors out. Dixon forced Catherine to stay with him until around 8:30 a.m. the next morning when he allowed Catherine to take her dog out. As she was chaining up her dog, Catherine saw Dixon's "boots, duct tape, bolt cutters and buckets stacked up by the kitchen window[.]" She "took off running up the driveway across the street" to Angelo's house. Dixon, seeing Catherine run to the neighbor's house, immediately left in Catherine's van.

Catherine, hysterical and shaking, told Angelo "he was here, he was here," that Dixon had held her captive and told her not to move when she was in bed, and that she finally got away.

A male friend of Angelo's called the Ozark County Sheriff's Department and handed the phone to Catherine, who described the situation. Chief Deputy Winston Collins ("Deputy Collins"), with the Ozark County Sheriff's office, responded. When Deputy Collins spoke with Catherine at her house, she was very excited and fearful. She told Deputy Collins that Dixon had held her against her will for several hours that morning and had threatened to hurt her. She also said that Dixon had left the scene in her van. Catherine provided the sheriff's department a voluntary written statement of events that occurred on October 17, 2014.

On December 2, 2014, a complaint was filed charging Dixon with the class C felony of burglary in the second degree,[3] pursuant to section 569.170.[4]

On February 24, 2015, Dixon's preliminary hearing was held. Catherine was present with her attorney. During Catherine's testimony, the trial court interrupted proceedings due to Catherine was "being evasive and difficult in answering questions," and went on the record to determine whether Catherine had initially provided false information to the sheriff's department. Catherine then testified her written statement was "pretty much" an accurate account of what happened on October 17, 2014. Dixon was later charged by information with second-degree burglary.

Dixon waived his right to a jury trial, and a bench trial commenced on May 1, 2015. Catherine invoked the spousal privilege and did not testify against Dixon at trial.

Angelo testified that in the cold and damp morning of October 17, 2014, Catherine ran up to her house wearing a short-sleeve shirt and no shoes. Angelo indicated that Catherine was standing there shaking, telling her "he was here, he was here." Dixon's counsel objected on the basis of hearsay, which the trial court did not rule upon. Angelo then testified that Catherine said that Dixon was here. The prosecutor then asked, "And while she was in that state, did she tell you what had happened?" Dixon's counsel again objected on the basis of hearsay. The prosecutor argued that the statements fell under the excited utterance exception, and the trial court overruled the objection.

---

[3] Dixon was also charged with felonious restraint, but that charge was later dismissed by the prosecutor.

[4] All references to statutes are to RSMo 2000, unless otherwise indicated.

Angelo then testified as follows:

She said [Dixon] had held her captive, and she was on the phone talking to the police by this time. And she said [Dixon] had held her captive. And I gave her a pair of shoes and the sweater right away, you know. And she said that he had held her captive and that she finally got away.

And I said, well, how did you get away? And she said, because of the dog. . . . He told her not to move, when she was in bed, she said.

Dixon's counsel again objected on the basis of hearsay. The trial court overruled the objection in part, but indicated that a foundation needed to be shown that "this excitement causing the excited utterance is continuing."

Seeking to lay this foundation, the prosecutor asked Angelo, "When -- when she made these statements to you about that he told her not to move and held her there, was she still hysterical and shaking?" Angelo responded, "Pretty much. . . . She was very excitable, just shaking."

Later in the trial, the prosecutor offered Exhibit 2—Catherine's written statement to the sheriff's department—in evidence during Deputy Collins' testimony. Dixon's counsel objected on hearsay grounds. The trial court received the exhibit, but deferred ruling on the hearsay objection until it could review the law on the subject.[5]

When the prosecutor finished presenting live testimony, he announced his intent to read into the court record the transcript of Catherine's preliminary hearing testimony, which had previously been filed with the court. Defense counsel objected on the basis that the State was offering a partial transcript of what was functionally an investigation into whether Catherine was guilty of perjury, and that the admission of the testimony violated the Confrontation Clause. The trial court allowed the prosecutor to read the transcript into the record.

---

[5] The record indicates that the trial court did not rule on this objection on the record during the proceedings of this case.

The State offered in evidence Catherine's petition for order of protection ("Exhibit 1"). Defense counsel objected on the basis of prior bad acts and hearsay. The trial court accepted the exhibit, but reserved ruling on the objection pending review of case law.[6]

The trial court took the case under advisement and issued a judgment on May 11, 2015, finding Dixon guilty of burglary in the second degree. The trial court sentenced Dixon to seven years' imprisonment, suspended execution of sentence, ordered Dixon to complete a 120-day term of shock incarceration, and placed Dixon on five years' supervised probation. This appeal followed.

In four points on appeal,[7] Dixon asserts the trial court: (1) erred in overruling Dixon's motion for judgment of acquittal at the close of all the evidence because there was insufficient evidence that Dixon entered the house unlawfully or intended to commit a crime therein; (2) abused its discretion in admitting hearsay statements of Catherine contained in Exhibit 2, Catherine's written statement to the sheriff's department, and through the preliminary hearing transcript; (3) abused its discretion in admitting Angelo's testimony as to what Catherine told her about the crime; and (4) abused its discretion in admitting Catherine's statements in her ex parte motion for protection. For ease of analysis, we address Dixon's points out of order.

---

[6] There is no indication in the record that the trial court ever ruled on this objection.

[7] Dixon's arguments on appeal are either set forth under the banner of a multifarious point or an argument section, which extends beyond the point relied on. These are clear and serious violations of Rule 84.04, which serve to undermine the clarity and effectiveness of arguments on appeal. In this instance the State, and this Court, are able to discern the nature of Dixon's arguments, and this court will not dismiss Dixon's appeal outright or deny any of his points out of hand. However, we caution appellate counsel to consult the mandatory dictates of Rule 84.04.

All rule references are to Missouri Court Rules (2016).

6

**Standard of Review**

To determine whether the evidence presented was sufficient to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but rather accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences.

*State v. Ess*, 453 S.W.3d 196, 206 (Mo. banc 2015) (internal quotation and citation omitted). This Court, however, "may not supply missing evidence, or give the State the benefit of unreasonable, speculative or forced inferences." *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001) (internal quotation and citation omitted). Evidence is sufficient to support a conviction when "there is sufficient evidence from which a reasonable [fact-finder] might have found the defendant guilty beyond a reasonable doubt." *State v. Coleman*, 463 S.W.3d 353, 354 (Mo. banc 2015) (internal quotation and citation omitted).

**Analysis**

*Point II: Admission of Preliminary Hearing Transcript of Catherine's Testimony and Her Written Statement to Law Enforcement*

In his second point, Dixon argues that the trial court abused its discretion in admitting the preliminary hearing transcript of Catherine's testimony and her written statement to law enforcement. Although we accept Dixon's explanation for this arguably multifarious point,[8] his every hearsay, Confrontation Clause, or other objection to the admission of such evidence fails under the reasoning detailed at length in *State v. Aaron*, 218 S.W.3d 501, 505-17 (Mo.App. W.D. 2007). Point II is denied.

---

[8] To quote Dixon's brief, "the two issues are inextricably intertwined, in that Catherine's preliminary hearing testimony included that what she put in her written statement, Ex. 2, was an accurate recitation of the events for which [Dixon] was on trial[,]" so that "the single ruling of allowing the reading of the transcript included admitting the contents of [Catherine's written statement] by reference, whether or not the exhibit was separately admitted into evidence."

*Point III:  Admission of Angelo's Testimony About Catherine's Statements*

In his third point, Dixon claims that the trial court erred in admitting Angelo's testimony as to Catherine's statements that Dixon had held her captive and told her not to move.

At trial, Angelo testified that in the cold and damp morning of October 17, 2014, Catherine ran up to her house wearing a short-sleeve shirt and no shoes.  Angelo indicated that Catherine was standing there hysterical and shaking, telling her "he was here, he was here."  Dixon's counsel objected on the basis of hearsay, which the trial court did not rule upon.  Angelo then testified that Catherine said Dixon was there.  The prosecutor then asked, "And while she was in that state, did she tell you what had happened?"  Dixon's counsel again objected on the basis of hearsay.  The prosecutor indicated that the statements fell under the excited utterance exception, and the trial court overruled the objection.

> She said [Dixon] had held her captive, and she was on the phone talking to the police by this time.  And she said [Dixon] had held her captive.  And I gave her a pair of shoes and the sweater right away, you know.  And she said that he had held her captive and that she finally got away.
>
> And I said, well, how did you get away?  And she said, because of the dog. . . .  He told her not to move, when she was in bed, she said.

Dixon's counsel again objected on the basis of hearsay.  The trial court overruled the objection in part, but indicated that a foundation needed to be shown that "this excitement causing the excited utterance is continuing."

Seeking to lay this foundation, the prosecutor asked Angelo, "When -- when she made these statements to you about that he told her not to move and held her there, was she still hysterical and shaking?"  Angelo responded, "Pretty much. . . . She was very excitable, just shaking."

"The excited utterance exception to the hearsay rule depends on a startling or unusual occurrence sufficient to overcome normal reflection such that the ensuing declaration is a

8

spontaneous reaction to the startling event." ***State v. Kemp***, 212 S.W.3d 135, 146 (Mo. banc 2007)

(internal quotation and citation omitted). As our supreme court in ***Kemp*** indicated:

> [E]xcited utterances are inherently trustworthy because the startling nature of the event is speaking through the person instead of the person speaking about the event. Because the statement is spontaneous and made under the influence of events, the statement is assumed trustworthy because it is unadorned by thoughtful reflection. Among the factors to be considered in determining whether an excited utterance exists are [(1)] the time between the startling event and the declaration, [(2)] whether the declaration is in response to a question, [(3)] whether the declaration is self-serving, and [(4)] the declarant's physical and mental condition at the time of the declaration. While no one factor necessarily results in automatic exclusion, all should be considered in determining whether the declaration was the result of reflective thought.

***Id.*** (internal quotation and citation omitted).

> The supreme court further explained:

> The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy. This exception is premised on the idea that where the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event, the utterance may be taken as expressing the true belief of the declarant.

***Id.*** (internal quotation and citation omitted).

The evidence, as we must view it, points to a very startling event: Catherine, asleep in bed in the middle of the night, suddenly awakened by a man she recognized as her estranged spouse shouting "hey" and telling her "Dont [sic] Fucking Move." Dixon held her captive the rest of the night, and she was only able to escape by letting her dog out.

The time between when Catherine suffered the startling event, and when she made the statements, is not long. Angelo testified that Catherine came running to her house sometime between 8:30 and 9:00 in the morning. Catherine gave a two-page written account to the sheriff's department that morning at 10:04 a.m. Angelo essentially recounts in her testimony that Catherine ran up to her shouting, "he was here, he was here"; she gave Catherine more clothes to put on;

9

Angelo's male friend called the sheriff's department and handed the phone to Catherine; Catherine told Angelo that Dixon held her captive and she got away because of letting her dog out; and that Catherine told Angelo that Dixon told her not to move while Catherine was in bed.

The evidence supports the inference that Catherine made the challenged statements without the adornment of thoughtful reflection. Catherine's statements were of a simple nature. The statements were out of narrative order, and reflect the disjunction of hysteria more than a thoughtful and reflective narrative.

As to the second element under *Kemp*, the record is unclear to what extent the challenged statements were in response to questions. While Angelo testified that at some point Catherine was speaking to the sheriff's department, the evidence is unclear whether the statements Angelo recounted were statements she overheard Catherine make to the sheriff's department, were statements made in response to questions from Angelo, or were spontaneous and unprompted statements by Catherine.

Dixon's brief suggests that Catherine's statements were "self-serving" because they "accus[ed] [Dixon] of various offenses." It is true that the statements imply potentially criminal conduct by Catherine's estranged spouse. However, "[i]f a statement otherwise meets the excited utterance test[,] it should not be excluded simply because it is helpful to the declarant's position." *State v. Williams*, 673 S.W.2d 32, 35 (Mo. banc 1984) (internal quotation and citation omitted).

With respect to the fourth element under *Kemp*, Angelo testified that Catherine was "hysterical," "excitable," and "shaking" when Catherine made the challenged statements.

In their totality, the elements for our consideration under *Kemp* support the admission of the statements as excited utterances. Quite simply, Catherine's statements were "made under such

10

circumstances as to indicate [they are] trustworthy." **Kemp**, 212 S.W.3d at 146. The trial court did not abuse its discretion in allowing the admission of Catherine's statements. Point III is denied.

### Point IV: Admission of Exhibit 1

In his fourth point, Dixon argues that the trial court abused its discretion in admitting statements contained in State's Exhibit 1—Catherine's petition for an ex parte order of protection, on the basis that they were testimonial hearsay.

At trial, the State offered into evidence State's Exhibit 1, a petition, signed under oath by Catherine, for an order of protection against Dixon. Dixon's counsel objected on the basis of prior bad acts and hearsay. The trial court accepted the exhibit, but indicated it would reserve ruling on the objection until it was able to research the law on the issue. The trial court issued its judgment without indicating whether it had admitted or considered State's Exhibit 1.

"In a judge-tried case, we presume that the trial judge was not prejudiced by inadmissible evidence and was not influenced by it in reaching a judgment, unless it is clear from the record that the trial judge considered and relied upon the inadmissible evidence." **Crites**, 400 S.W.3d at 834 (internal quotations and citations omitted). Here, there is no clear and obvious reliance by the trial court on State's Exhibit 1 in reaching its decision. *See* **Ernst**, 164 S.W.3d at 75. The trial court did not indicate that it was relying on Exhibit 1 during proceedings, did not make explicit that it was relying on the Exhibit 1 in its judgment, and Exhibit 1 is not necessary to support any element of the crime of which Dixon was convicted. We must, therefore, presume that there was no prejudice to Dixon. *See* **id.** The trial court did not abuse its discretion in failing to exclude Exhibit 1 from evidence. Point IV is denied.

11

### Point I: Evidence of Second-Degree Burglary

In Dixon's first point, he argues that the trial court erred in failing to find that there was insufficient evidence that: (1) Dixon knowingly entered the house unlawfully, and (2) Dixon intended to commit a crime therein.

The elements of burglary in the second degree are set out in section 569.170. "A person commits the crime of burglary in the second degree when he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein." § 569.170. "With respect to his conduct or to attendant circumstances, a person acts knowingly or with knowledge when he is aware of his conduct or that those circumstances exist." *State v. Brown*, 457 S.W.3d 772, 779 (Mo.App. E.D. 2014) (citing section 562.016.3). "Intent to commit a crime is most often proved by circumstantial evidence and it may be inferred from surrounding facts or the act itself." *State v. Wrice*, 389 S.W.3d 738, 740 (Mo.App. E.D. 2013).

### Unlawful Entry

A person enters unlawfully when he is not licensed or privileged to do so and is aware he has no privilege to enter. *State v. Hunt*, 451 S.W.3d 251, 257 (Mo. banc 2014). "Knowledge is typically inferred from circumstantial evidence because direct evidence is rarely available." *Id.*

Dixon and Catherine had been living separately before the events of October 17, 2014, took place. The house Dixon broke into was not the couple's marital house, and the couple had never lived there together. Rather, the house was the residence of Catherine's daughter, and Catherine had only lived in the house for approximately one week before the break-in.

At approximately 3:30 a.m. on October 17, 2014, Dixon parked his car some distance from the house Catherine was occupying. A reasonable inference available from this evidence is that

Dixon parked a distance from the house because he did not want the noise of his car to alert Catherine to his presence. Dixon moved to the back of the home, stacked buckets underneath the kitchen window, removed the kitchen screen, and propped open the kitchen window with a screwdriver to facilitate his entry.

On appeal, Dixon points to his trial testimony that he had been to the house before when he was helping Catherine clean and get it ready to be rented. However, this ignores our standard of review, which requires us to disregard testimony and evidence contrary to the judgment. The evidence presented supports the conclusion that Dixon had no lawful right to enter the house.

### *Purpose of Committing a Crime Within the Premises*

In the same point, Dixon argues there was insufficient evidence that he entered the house with the purpose of committing a crime within the premises.

There was evidence that Dixon, in the middle of the night, parked his car some distance from the house, and the reasonable available inference—in the light most favorable to the judgment—is that Dixon did so to avoid alerting Catherine to his presence. Our standard of review also requires the conclusion that Dixon brought, to the rear of the house, a large logging chain, duct tape, and bolt cutters for an unlawful purpose. We may reasonably infer that Dixon planned to use these items for some sort of illegal restraint or assault against Catherine.

Surreptitiously, Dixon made his way through the house and into Catherine's bedroom. Finding Catherine asleep, Dixon stopped at the head of her bed, shouted "hey," and then said, "Dont [sic] Fucking Move." This is sufficient evidence to support the conclusion that Dixon entered the house for the purpose of committing a crime within the premises. The trial court did not err in not finding that there was sufficient evidence to support Dixon's conviction for burglary. Point I is denied.

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

GARY W. LYNCH, P.J. - CONCURS

DANIEL E. SCOTT, J. - CONCURS