STATE of Missouri, Respondent,

v.

Christopher D. HENDREN, Appellant.

WD 78751

Missouri Court of Appeals,
Western District.

Filed: March 21, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 2017

Craig A. Johnston, Columbia, for appellant.

Karen L. Kramer, Jefferson City for respondent

Before Division Three: Alok Ahuja, P.J., and Victor C. Howard and James E. Welsh, JJ.

Alok Ahuja, Judge

Following a bench trial in the Circuit Court of Johnson County, Appellant Christopher Hendren was convicted of felony murder, armed criminal action, and burglary in the first degree. On appeal, Hendren argues that the circuit court erred in convicting him of *felony* second-degree murder, and the associated armed criminal action charge, because the charging instrument charged him only with *conventional* second-degree murder. Hendren further contends that there was insufficient evidence to prove that he entered the house of the victim unlawfully, as required to support his burglary conviction. We affirm.

### Factual Background

On January 25, 2012, Walter Feldman was found dead in the bedroom of his home in Centerview. He had died from multiple gunshot wounds to the head.

In investigating the murder, the police searched the cellular phone of Walter's biological son, Jacob, with Jacob's consent.[1] The phone's contents included a photograph of two white males dressed in dark-colored clothes with hoods up and bandanas covering their faces. The two males were Jacob and Hendren. Jacob was holding a shotgun or rifle.

Jacob was not living with his father at the time of Walter's murder. In November 2011, Jacob moved out of his father's house and moved in with Jane Terrell and Mandy DeWitt for approximately one month, because (Jacob claimed) his father was physically abusive. While staying with Terrell, Jacob talked about doing violence to his father, but Terrell did not take him seriously. Even when living away from his father, Jacob made contact with his father and visited his father at his house. Jacob visited Walter with at least one of his friends, Matt Thomas, and was seen at Walter's house during a social gathering by Walter's employer. At the time of the homicide, Jacob was living with his grandparents.

On February 28, 2012, Detective David Mayhew interviewed Hendren. During the interview, Hendren admitted that he participated in Walter's murder on the night of January 22, 2012. According to Hendren, Jacob told Hendren that he was going to sneak into his father's house without waking him up, and steal some marijuana that Jacob could sell. According to Hendren, Jacob told him that the last time Walter had caught Jacob stealing marijuana, Walter threatened that Jacob would pay "in blood." Jacob told Hendren that he was going to carry something for protec-

---

1. Because Walter Feldman and his son Jacob Feldman shared the same last name, we refer to them in this opinion by their first names. No familiarity or disrespect is intended.

tion just in case his father woke up "swinging." Hendren stated that he did not believe that Jacob intended to carry out his plan.

On the night of the murder, Jacob and Hendren took five firearms from Jacob's grandparents' home, loaded them into Jacob's grandfather's car, and drove to Walter's home. Prior to entering the home at approximately 11:15 or 11:30 p.m., Jacob and Hendren took a photo of themselves in an alley behind the house; Jacob was holding one of the guns taken from Jacob's grandfather's house.

Initially, Hendren told Detective Mayhew that he had stayed outside Walter's house, and that only Jacob had entered. Later, Hendren admitted that he entered the house with Jacob through the side door. Both Jacob and Hendren were carrying .22 caliber firearms. Hendren claimed that his gun was not loaded, and that Jacob had all the shells.

Jacob looked into his father's bedroom and told Hendren to shoot his father. Hendren refused. Hendren stepped to the side, and Jacob shot his gun. Jacob said that he did not know if his father was dead, but he was worried that the shots could be heard from the outside, and he asked Hendren to shut the outside door. After Hendren shut the door, Jacob grabbed the other gun from Hendren, loaded it, re-entered the bedroom, and fired two additional shots.

Jacob then went into his father's bedroom and walked out with a big box that had marijuana in it. Before leaving, Jacob went back into the bedroom, fired a fourth shot, and picked up the shell casings. He told Hendren not to tell anybody what had happened. Afterwards, Jacob and Hendren returned to Jacob's grandfather's house, where they put the guns away. Hendren spent the rest of the weekend with Jacob.

During his interview with Detective Mayhew, Hendren also completed the following written statement as to what transpired on January 22, 2012:

Around 10:30 Jake decided he was gonna kill his dad. I didn't know what to do. So I helped him put the guns away in the car. He told me he had been waiting for this for a long time. I went with him. We parked the car by his dad's house. He shut it off, and he told me to grab a gun. I grabbed a gun and followed him in. Repeatedly he asked me to do it. I couldn't, I was scared, and I didn't want to get any more involved. I didn't even want to go to begin with. I stood by the fridge. He fired off a shot. Then told me to shut the "entrance" door. I did then walked back to the fridge. He asked for the other gun, I gave it to him, he walked around the corner and I heard him load it and fire again. I heard him unload and shoot again. Then he walked in and grabbed something out of the room, it was a shoebox for boots, he said it had his dad's stash in it. He picked up the shells and put them in his pocket. Then we left and went back to his grandparent's house and put the guns back. We went upstairs. He started going through the box. I was setting on the bed. I was afraid if I ever said anything to any one, that he would kill me. I played it cool like I was there for him. I didn't sleep that night, I thought he might have thought I was going to tell someone, and possibly shot me in my sleep. I stayed another day at his house so he would trust me, and not try to hurt me at all. Up until tonight, I have not told anyone about this incident, and I was hoping that I could find a way to slowly lose contact with Jake for good.

Although Hendren was sixteen years old at the time of the alleged offenses, an order was entered by the juvenile division

allowing Hendren to be prosecuted under general law.

Hendren was charged, acting alone or in concert with another, with: conventional second-degree murder[2] for knowingly causing the death of Walter Hayes Feldman by shooting him, in violation of § 565.021.1(1)[3] (Count I); an associated count of armed criminal action (Count II); and burglary in the first-degree, for knowingly entering Feldman's home unlawfully "for the purpose of committing murder therein, and in effecting entry [Hendren] was armed with a deadly weapon" (Count III).

Hendren waived his right to a jury trial, and was tried to the court. After the close of the evidence and closing arguments, the trial court overruled Hendren's motion for judgment of acquittal, and found as follows:

> The Court has reviewed the evidence that was presented here at trial in this case. It also looked at the second degree murder statute which is what we were operating under in this case that was amended by the State of Missouri under 565.021 with regards to murder in the second degree.
>
> . . .
>
> The second-degree murder statute has several provisions, several provisions with regards to knowingly caused death, but also it has an attendant section which the Court is required to consider with regard to during the perpetration of any felony that a death caused by the participants in the crime requires a finding of guilty on murder in the second degree because of the fact that there was a felony committed as part of that statute.

After defense counsel asked for clarification, the court explained:

> Under 569.170 if there is a crime committed, a felony committed, where the person who is not a participant in the crime is in the inhabitable structure, that makes it a first degree burglary, and then that is where the second degree comes in. I think it's Section 2 of 565.021, Subsection 2, with regard to the commission of a felony in which there is a death and that creates the felony murder.

In response to defense counsel's queries, the trial court stated that it was finding Hendren not guilty of conventional second-degree murder.

The trial court found Hendren guilty of armed criminal action for committing felony murder while possessing a weapon, and burglary in the first-degree for entering Walter Feldman's home for the purpose of committing a felony therein while a person who was not a participant in the crime was present in the residence.[4] The court sen-

---

2. The caption in the information in lieu of indictment charges "Murder 2nd degree," but in the body cites to § 565.020, the first-degree murder statute, and alleges that Hendren committed "the class A felony of murder in the first degree." The factual allegations allege, however, that "the defendant knowingly caused the death of Walter Hayes Feldman by shooting him," *i.e.*, conventional second-degree murder. The prosecution made clear to the trial court its intention to charge Hendren with second-degree murder in Count I, and Hendren does not make an issue of the wording of Count I on appeal.

3. Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, updated through the 2011 Cumulative Supplement.

4. The circuit court's finding that Hendren was guilty of first-degree burglary because he unlawfully entered a building in which a nonparticipant was present differs from the factual allegations of the Information in Lieu of Indictment, which alleged that Hendren's offense constituted first-degree burglary because he entered the residence "armed with a deadly weapon." Although Hendren's briefing notes this variance, he does not argue that it

tenced Hendren to 15 years' imprisonment on each count, with the sentences for murder and armed criminal action to run concurrently, and the sentence for burglary to run consecutively to the other two sentences. This appeal follows.

## Analysis

### I.

In his first Point, Hendren contends that the trial court erred in finding him guilty of the uncharged offense of *felony* second-degree murder, because he was charged with *conventional* second-degree murder. We find no error.

Section 565.021 defines the offense of second-degree murder, including both "conventional" and "felony" second-degree murder. It provides:

1. A person commits the crime of murder in the second degree if he:

 (1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

 (2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

§ 565.021. Subsection 3 of the same statute provides:

3. Notwithstanding section 556.046 and section 565.025[, addressing lesser included offenses], in any charge of murder in the second degree, ... in a jury-waived trial, the judge shall consider,

any and all of the subdivisions in subsection 1 of this section which are supported by the evidence and requested by one of the parties or the court.

Hendren makes two separate arguments to challenge his second-degree murder conviction. First, he contends that his conviction for the uncharged offense of felony murder violated his right to notice of the charges against him, as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article I, §§ 10, 17 and 18(a) of the Missouri Constitution. Hendren's second argument contends that no "request" for consideration of felony second-degree murder was made prior to the court's announcement of its verdict, in violation of § 565.021.3.

### A.

 With respect to Hendren's first argument, we recognize that "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Ark.*, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948). "The purpose of an indictment is to provide due process notice to the accused of the charges pending against him so that he may prepare an adequate defense." *State v. Gheen*, 41 S.W.3d 598, 602 (Mo. App. W.D. 2001) (citation omitted).

 Conviction on a basis which differs from the allegations of a charging instrument has been held to be consistent with due-process notice requirements in at least two contexts. First, as Hendren acknowledges, it is well-established that a conviction for an uncharged offense is proper,

constitutes reversible error, and we do not further address it.

and does not violate due-process notice requirements, when the accused "is charged with a greater offense but convicted of an uncharged lesser-included offense." *T.S.G. v. Juvenile Officer*, 322 S.W.3d 145, 149 (Mo. App. W.D. 2010); *see also State v. Bradshaw*, 411 S.W.3d 399, 403 (Mo. App. S.D. 2013). In Missouri, the possibility of conviction of lesser-included offenses is governed generally by § 556.046.1, which provides that an offense is a lesser-included offense when:

1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

2) It is specifically denominated by statute as a lesser degree of the offense charged; or

3) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein.

The Missouri Supreme Court has specifically held that due-process notice requirements are satisfied when a defendant is convicted of a lesser-included offense which is denominated as such by statute, even if it is not "necessarily included" within the greater offense.

Section 556.046 is a legislative determination that an offense can be a lesser offense of another offense so that a charge of the greater will support a conviction of the lesser although the lesser is not necessarily included in the greater .... Of course, conviction upon a charge not made would be sheer denial of due process. However, by specifically denominating a crime as a lesser degree of another, the constitutional requirements that one be apprised of the charge against him, found in the Sixth Amendment to the United States Constitution and Art. I, § 18(a) of the Missouri Constitution are met.

*State v. Wilkerson*, 616 S.W.2d 829, 833 (Mo. banc 1981) (citations and internal quotation marks omitted).

██ As a second example of convictions based on factual allegations which differ from a charging instrument, it is well established that a defendant may be convicted based on the theory of accomplice liability, even though the defendant was charged with committing an offense personally. It is well-established in Missouri that "it is proper to submit a theory of accomplice liability despite having charged the defendant as a principal." *State v. Brewer*, 476 S.W.3d 321, 325 (Mo. App. E.D. 2015) (citing *State v. Isa*, 850 S.W.2d 876, 898 (Mo. banc 1993)). Federal courts have held that convicting an individual for aiding and abetting the commission of an offense, when the individual was charged as a principal, does not violate due-process notice principles, on the theory that a conviction based on accessory liability "does not constitute a separate crime; it is instead merely a recognized variant of the underlying offense." *United States v. Alexander*, 447 F.3d 1290, 1299 (10th Cir. 2006); *see also, e.g., Hack v. Elo*, 38 Fed. Appx. 189, 193 (6th Cir. 2002).

By virtue of § 565.021.3, Hendren had notice of the possibility that, although he was charged with conventional second-degree murder, he could be convicted of felony murder if the facts warranted. "Conventional" and "felony" second-degree murder are both defined as second-degree murder in § 565.021.1. That statute *requires* the judge in a court-tried case to consider both conventional and felony second-degree murder, as long as they are "supported by the evidence and requested by one of the parties or the court." Moreover, the same charging instrument which charged Hendren with second-degree murder also charged him with first-degree burglary, the underlying felony which ulti-

mately supported his conviction for felony murder. Given that Hendren was charged with second-degree murder and with another felony connected with Walter's death, § 565.021.3 put him on notice of the possibility that the court would consider felony murder as one of the two variants of second-degree murder.[5]

■ Our conclusion that Hendren's right to notice was not violated is buttressed by caselaw applying the "variance" doctrine. Under the "variance" caselaw, "when a crime may be committed by any of several methods, ... the method or methods submitted in the verdict directing instruction must be among those alleged in the information." *State v. Lee*, 841 S.W.2d 648, 650 (Mo. banc 1992) (citation and internal quotation marks omitted). "The reason for [this] rule ... is to foster and protect the primary purpose of the information, that of providing notice to the accused so that the accused may prepare an adequate defense against the charges brought." *Lee*, 841 S.W.2d at 650; *see also State v. Tillman*, 289 S.W.3d 282, 292 (Mo. App. W.D. 2009) (citation omitted).

■ A variance between the information and instruction "alone is not conclusive to the question of whether there is reversible error." *Lee*, 841 S.W.2d at 650.

A variance is not fatal, and will not require reversal, unless it submits a new and distinct offense from that with which defendant was charged. A variance must be material, and defendant must be prejudiced to warrant reversal.

Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges.

*State v. Glass*, 136 S.W.3d 496, 520 (Mo. banc 2004) (citations and internal quotation marks omitted). Even if a variance is material, it is not always prejudicial. *See, e.g., Lee*, 841 S.W.2d at 650; *see also* § 545.030.1(18).

■ In this case, even if we assume that the felony-murder charge of which Hendren was convicted materially varied from the offense charged in the information, he has not identified any way in which his ability to defend against the charge was prejudiced, and we cannot conceive of any. All of the evidence that was admitted at trial was relevant to the offenses with which Hendren was charged (conventional second-degree murder, armed criminal action, and burglary), and also served to establish his guilt of the offense of felony murder—namely, that Walter was killed in the perpetration of the felony of burglary in which Hendren was an active participant. Hendren had an incentive to contest the allegations that he had committed the offenses as charged; the court relied on those same allegations to convict Hendren of felony murder. Hendren would not be entitled to relief under the "variance" doctrine.

■ Hendren also argues that his conviction of felony murder violated the Mis-

---

**5.** Hendren cites *State v. Kohser*, 46 S.W.3d 108 (Mo. App. S.D. 2001), and *State v. Hall*, 956 S.W.2d 427 (Mo. App. E.D. 1997), to support his argument that he was denied adequate notice. In both cases, however, the defendant was not originally charged with the underlying felony which was later relied upon to support his felony-murder conviction. *Kohser*, 46 S.W.3d at 111 (noting that defendant was charged solely with first-degree murder);

*Hall*, 956 S.W.2d at 430 (at the time the State sought leave to file an amended information at the close of its evidence to add a felony-murder charge, "no notice of any underlying felony had been given"). That is a critical distinction. As we have explained in the text, in this case Hendren was on explicit notice, prior to trial, of the first-degree burglary charge which ultimately provided the basis for his conviction of felony murder.

souri Approved Charges, specifically MACH–CR2d 13.04, the pattern charge for conventional second-degree murder. Note on Use # 2 to MACH–CR2d 13.04 states that,

> If the state intends to submit murder in the second degree—felony under the provision of Section 565.021.1(2), RSMo 1994, then in order "to furnish the accused with such a description of the charge against him as will enable him to make his defense," *State v. Mace*, 357 S.W.2d 923, 925 (Mo. 1962), it is necessary to add the following to this charge after the word "him" by deleting the period and adding a comma in its place: and defendant is further given notice that should the state submit murder in the second degree—felony under Section 565.021.1(2), RSMo, it will be based on the death of [*name of victim*] as a result of the (immediate flight from the) (attempted) perpetration of the class _____ felony of _____ under Section _____, RSMo, committed by defendant.[6]

The Information in Lieu of Indictment which charged Hendren with conventional second-degree murder did not contain the notification required by this Note on Use.

The fact that the State may not have fully complied with the Notes on Use to MACH–CR2d 13.04 does not establish reversible error.

> [T]he MACH–CR forms are not mandated for usage in the same sense that the MAI–CR forms of pattern criminal instructions are required. An indictment or information that does not follow an appropriate MACH–CR charge can nonetheless meet the standard set by the constitutions and rule. Error is not established nor presumed because the

amended information did not follow MACH–CR . . . .

*State v. Reese*, 687 S.W.2d 635, 637 (Mo. App. S.D. 1985) (citations and internal quotation marks omitted). Supreme Court Rule 23.01(b), specifying the required contents of charging instruments, explicitly provides that charging instruments "that are substantially consistent" with the approved charges are deemed to comply with the Rule.

The Missouri Supreme Court rejected a claim identical to Hendren's in *State v. Blankenship*, 830 S.W.2d 1 (Mo. banc 1992). In *Blankenship*, a defendant was convicted of felony murder after being charged with first-degree murder. He argued that his conviction should be reversed because the charging instrument failed to provide him with the notice of the possibility that the prosecution would submit felony murder, as required by the Missouri Approved Charges (quoted in the Notes on Use to MAI–CR3d 313.06). Although the Supreme Court acknowledged that the State's failure to provide the notice required by the pattern charges and instructions "constitute[d] error," it held that the defendant had failed to establish prejudice justifying reversal. It explained:

> Defendant was not only charged with five counts of first degree murder, but, in a separate count of the same indictment, he was also charged with first degree robbery. Thus, defendant was placed on notice to defend a robbery. The purpose of the seventh Note on Use under [MAI–CR3d] 313.06 is "[t]o furnish the accused with a description of the charge against him as will enable him to make his defense." The purpose was accomplished here by the separate

---

6. A similar comment is made in Note on Use # 2 to MACH–CR2d 13.02 (first-degree murder); these notes to the Missouri Approved

Charges are quoted in Note on Use # 7 to MAI–CR3d 313.06, the pattern jury instruction for felony murder.

count charging defendant with robbery. Thus, since defendant was not prejudiced by the absence of a specific notice, the claim is denied.

*Id.* at 13 (citation omitted). Prejudice is lacking in this case for the same reason: Hendren was charged with first-degree burglary in a separate count, providing him with adequate notice of the charges he would be required to defend.

### B.

■■■ Hendren also argues that the court failed to comply with § 565.021.3, which provides that the court may consider felony murder only if "requested by one of the parties or the court."

The Southern District rejected this argument in *State v. Kohser*, 46 S.W.3d 108 (Mo. App. S.D. 2001).

the purpose of the request for a second-degree murder submission under the statutes cited is not to give Defendant *notice* of the crime charged. If a *request* for a second-degree submission was designed to give an accused notice of the second-degree submission, the request would have to be made before any evidence was adduced. This follows because the purpose of notice is to allow a defendant time to prepare an adequate defense. The plain language of § 565.021.3 provides that a judge shall consider the subdivisions of subsection 1 *which are supported by the evidence.* This italicized language from § 565.021.3 merely suggests the obvious, namely, neither the state nor an accused could make an informed request for a second-degree

murder submission until all evidence had been adduced. Similarly, a trial court could never make an informed decision to submit second degree on its own motion until all evidence had been presented. On the other hand, *notice* of the possibility of such a submission could only be meaningful for an accused if the notice came before trial so the accused could prepare.

*Id.* at 112 (citations and internal quotation marks omitted). *Kohser* held that it is the trial court's "prerogative under the statutes" to act upon its own motion to consider second-degree felony murder in a bench-tried case, and that the court's failure to expressly declare that it intended to consider felony murder, before actually doing so, did not prejudice the defendant. *Id.* at 113. The Court explained that,

After examining the record, the trial court here implicitly found there was a basis to acquit Defendant of first-degree murder, and convict him of second-degree murder. ... The fact that the court did not affirmatively announce to Defendant that it intended to consider murder in the second degree, either conventional or felony, is of no consequence.

*Id.*

For the reasons stated in *Kohser*, any failure by the trial court to announce its intention to consider felony murder at an earlier time was "of no consequence" to Hendren's defense of the charges against him, and does not justify reversal.[7]

Hendren's first Point is denied.

---

7. Hendren's first Point also argues that his armed criminal action conviction must be reversed because it "was dependent up[on] a conviction for conventional second-degree murder." As we have explained in the text, the circuit court was expressly authorized by statute to consider felony second-degree murder under the charging instrument. Because

felony murder is, by statute, an associated crime the court was entitled to consider, the court was authorized to convict him of armed criminal action in connection with that associated offense. *State v. Bradshaw*, 411 S.W.3d 399, 403 (Mo. App. S.D. 2013) ("The charge of kidnapping for the purpose of facilitating first-degree murder put defendant on notice

## II.

In his second Point, Hendren argues that the evidence was insufficient to prove beyond a reasonable doubt that he entered Walter's home unlawfully, as required to support his first-degree burglary conviction.

> When reviewing a challenge to the sufficiency of the evidence, the standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Jones*, 479 S.W.3d 100, 105 (Mo. banc 2016). "In a court-tried case, the sufficiency of the evidence is determined by the same standard as in a jury-tried case . . . ." *State v. Johnson*, 81 S.W.3d 212, 215 (Mo. App. S.D. 2002).

Section 569.160.1 defines burglary in the first degree:

> A person commits the crime of first-degree burglary if he knowingly enters unlawfully . . . in an inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in . . . the inhabitable structure or in in immediate flight therefrom,
>
> . . .
>
> (3) there is present in the structure another person who is not a participant in the crime.

For purposes of Chapter 569, "a person 'enters unlawfully' . . . in or upon premises when he is not licensed or privileged to do so." § 569.010(8).

> The mens rea "knowingly" modifies the phrase "enters unlawfully." Mo. Stat. Ann. § 569.160. A person acts "knowingly" with respect to his conduct or attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist. Section 562.016.3(1). Accordingly, a person "enters unlawfully" when he is aware he has no privilege to enter. Knowledge is typically inferred from circumstantial evidence because direct evidence is rarely available.

*State v. Hunt*, 451 S.W.3d 251, 257 (Mo. banc 2014) (citations and internal quotation marks omitted).

A burglary conviction "requires distinct findings of both unlawful entry and intent to commit a crime therein." *State v. Cooper*, 215 S.W.3d 123, 127 (Mo. banc 2007). "When a person has the consent of a resident to enter the home, he is not guilty of burglary, regardless of what other crimes he may have committed therein." *Id.* at

that he could be convicted of kidnapping for the purpose of facilitating [the lesser included offense of] second-degree murder."); *State v. Hayes*, 88 S.W.3d 47, 55–56 (Mo. App. W.D. 2002) ("This court has specifically held that a defendant charged with Armed Criminal Action in the commission of a felony may be convicted of Armed Criminal Action in the commission of a lesser included felony." (quoting *State v. Smith*, 737 S.W.2d 731, 734 (Mo. App. W.D. 1987)). *State v. Gant*, 586

S.W.2d 755 (Mo. App. W.D. 1979)), on which Hendren relies, is distinguishable because in that case, the defendant was convicted of armed criminal action associated with a *greater* offense than alleged in the charging instrument. *Id.* at 762. *See State v. Taylor*, 724 S.W.2d 531, 535 (Mo. App. W.D. 1986) (*Gant* inapplicable where defendant was convicted of armed criminal action associated with a lesser included offense of the offense charged).

126 (citation omitted). Even if a defendant enters the premises with the purpose of committing a crime inside, the entry can still be made lawfully. *Id.*

In challenging the sufficiency of the evidence as to unlawful entry, Hendren emphasizes that he entered Walter's house with Walter's son Jacob. Hendren argues that, because he was accompanied by Walter's son, who had recently resided in the home and been a guest there, the evidence was insufficient to prove beyond a reasonable doubt that Hendren knew that he did not have a license or privilege to enter Walter's house.

In *State v. Dixon*, 495 S.W.3d 812 (Mo. App. S.D. 2016), the Southern District recently addressed the lawfulness of entry in an analogous situation. In that case, defendant, an estranged husband, was convicted of second-degree burglary for entering his wife's residence. In analyzing whether there was sufficient evidence that his entry was unlawful, the Southern District emphasized that the couple "had been living separately" before the burglary, and that "the house [the defendant] broke into was not the couple's marital house and the couple never lived [in that house] together." *Id.* at 821. "Rather, the house was the residence of [the wife]'s daughter, and [the wife] had only lived in the house for approximately one week before the break-in." *Id.* The court in *Dixon* also stressed that the defendant entered the house at approximately 3:30 a.m., and "parked his car some distance from the house [his wife] was occupying." *Id.* Furthermore, "to facilitate his entry," the defendant in *Dixon* "moved to the back of the home, stacked buckets underneath the kitchen window, removed the kitchen screen, and propped open the kitchen window with a screwdriver." *Id.* The Court found this evidence sufficient to support the conclusion that the defendant had no lawful right to enter.

In this case, although Jacob was Walter's biological son, he had not lived with his father since November 2011, when Jacob moved out because his father was purportedly being abusive. The evidence indicates that, although Jacob was not living with his father, he had contact with his father and visited his father at his house, including with at least one of his friends. On the night in question, however, Jacob told Hendren that they were going to "sneak into" Walter's residence. They took five firearms with them from Jacob's grandparent's home. Jacob and Hendren entered through the house's side door at 11:15 p.m., when Walter was already in bed. They had armed themselves before attempting to enter the home, and according to Hendren, Jacob had "said that his dad would probably wake up swinging, and that if he had to, he was going to protect himself."

Viewing this evidence in the light most favorable to the verdict, a reasonable factfinder could conclude that Hendren knew that he and Jacob did not have a license or privilege to enter Walter's house that night, and that his entry was therefore knowingly unlawful. Point II is denied.

## Conclusion

The judgment of the circuit court is affirmed.

All concur.